Exhibit 3

1   County of Los Angeles  )                              Case Nos. 31-CA-29713 et al.
2                         ) SS
3   State of California    )

4                        **Confidential Witness Affidavit**

5   **I, Helen Kibbler, being first duly sworn upon my oath, hereby state as follows:**

6   **I have been given assurances by an agent of the National Labor Relations Board that this**
7   **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8   **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9   **Affidavit in connection with a formal proceeding.**

10  My address is ███████  █████████████████████.

11  My phone number is 951.847.6992.

12      I work for Chino Valley Medical Center ("Chino" or "the Employer") located at 5451

13  Walnut Avenue, Chino, CA 91710 as a full-time staff nurse. I am a registered nurse. I started

14  working for Chino from 2001-2004 as a per diem nurse. I began working as a full-time staff

15  nurse at Chino in about June 2006. I work the day shift in the Emergency Room at Chino from

16  7:00 a.m. until 7:30 p.m. I earn about $39.75/hour. I receive medical, dental, and vision

17  coverage through my Employer. I have to pay for a portion of the coverage but I do not recall

18  how much I pay. I provide patient care in my capacity as a nurse in the ER. I have not served

19  as relief charge nurse. There are approximately 6-7 RNs on my shift in the ER. My direct

20  supervisor in the ER is Nurse Manager Cheryl Gilliatt ("Cheryl"). I work with different charge

21  nurses including Anne Johnson, Susie Eiley ("Eiley"), and Samantha Jones. I was on medical

22  leave from January 28, 2010 and returned about a week after the election for the Union which

23  took place on April 1 and 2, 2010. I went back on medical leave starting on May 28, 2010 and

24  continue to be on medical leave to date.

25

Page 1

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page: ___HK___

**Exhibit 3**
**Page 57 of 402**

**Union Activity**

1        Shortly before the election in April 2010, I attended one union meeting held by United Nurses Associations of California Union of Health Care Professionals ("UNAC" or the "the Union") at Denny's in Chino. I voted in the election. After the election in April 2010, I began to wear a union button that says "UNAC" on my name badge. The button is about the size of a quarter. I have worn this button everyday that I worked since the election.

**Discipline**

        On May 1, 2010, I was late for work because I had a flat tire on my way in. I arrived at 7:26 a.m. At about 7:40 a.m, Susie Eiley, the charge nurse, told me that Cheryl wanted to see me in her office. At about 7:45 a.m. I went to Cheryl's office and brought my co-worker Yesesnia DeSantiago with me. Cheryl was in her office when we arrived. Present also was Linda Ruggio ("Linda"), Chief Nursing Officer. Before I stepped into Cheryl's office, I started to read aloud from a Weingarten card. I requested a union rep be present if this was going to be a disciplinary action. Before I finished reading, Linda and Cheryl told me that I didn't need to do that and that this was just for conversation. I asked if I could record this. Linda told me no. I said that I wanted to have Yesenia present with me. Linda said that was fine. Yesenia and I stood in the office with the door to the office open. Cheryl started saying that the reason I had been called in was I was not fulfilling my essential job duties. I said again "but this is not a disciplinary action?" and Cheryl said no. Linda said that there was no need for a union representative. Linda said that I had been late and asked why I hadn't called. I said that I didn't know until I got into my car that my tire was flat. Linda said I should have called and I said that I was on the freeway and it was illegal to call from a cell phone while driving. I told them that I had picture documentation. No one responded when I said this. I have not provided the Employer with copies of the pictures I took of my flat tire. Linda said that I was in clear violation of a hospital policy and it was being brought to my attention. Cheryl placed on her desk a copy of a document entitled "Performance Improvement Plan." This document

I have carefully and completely read and understand the contents of this page: _____

**Exhibit 3**
**Page 58 of 402**

1   is attached as Attachment 1.  Cheryl said that I could read it if I wanted to.  Cheryl said that I

2   did not have to sign it.  I looked at the document and I said that I believed that by signing it I

3   only acknowledged receiving it but not that I agreed with it.  Cheryl said that the performance

4   improvement plan was going to be put in my file.  I said "something is being put in my file

5   and this is not considered a disciplinary action."  No one responded to me when I said this.

6   Linda said that there was a copy of the policy I had violated attached to my write up.  I do not

7   recall having seen the policy attached to my write up before I was written up on May 1, 2010.  I

8   signed the document.  The meeting lasted about 20 minutes.  Yesenia did not speak during this

9   meeting.  Sometime after this meeting, Cheryl gave me a copy of my write up.

10        My write up refers also to me not clocking out on 4/30/10 or for lunch but I do not recall

11   Cheryl or Linda mentioning that during my meeting with them on May 1, 2010.  Also attached

12   to my write up is what looks like a time card.  I do not know what it is and neither Cheryl nor

13   Linda mentioned it during my May 1, 2010 meeting with them.

14        On May 5, 2010, at about 9:30 or 10 a.m. I requested a 10-minute break from charge

15   nurse Susie Eiley.  (We are allowed a half an hour lunch break.  We are also allowed a 10-

16   minute break within the first four hours of our shift and 10-minutes within the last four hours

17   of our shift.)  Eiley said that I could go and I went outside for a smoke.  I set my timer and

18   returned to work after 4 ½ minutes.  I went to lunch that day at about noon.  There were about

19   two minutes left on my lunch and I was sitting in the break room when Eiley came in and said

20   that I had to get back and clock in.  I said that I was on my lunch break and I calculated that it

21   takes me 14.3 seconds to walk from the break room to the time clock and I had two minutes

22   left on my break so I had plenty of time to make it back.  Eiley repeated that I couldn't be late

23   and that she didn't want me getting in trouble.  I clocked back in on time for lunch.  At about

24   2:30 p.m. and we were really quiet in the ER.  I asked Eiley if I could go out for part of my ten-

25   minute break.  Eiley said it was ok.  I went out for my break had two little puffs off my

26   cigarette—I was gone for 1 minute and 30 seconds and returned to work.  At 4:30-5 p.m. I

I have carefully and completely read and understand the contents of this page:_____

**Exhibit 3**
**Page 59 of 402**

1  asked Eiley if I could have the rest of my break. I said that I had only used 1 mintue and 30

2  seconds and I don't go to the bathroom during my shift. Eiley said that I couldn't go. The

3  float nurse came by while we were having this conversation and said it was ok and that she/he

4  would cover for me (I don't recall who it was). I went and took a two-minute break. When I

5  came back into work, Eiley told me that she had to report me. I said "Susie, I didn't even take

6  the ten minutes." Eiley said that if I didn't take it all I forfeited it. Eiley said that she had to

7  write me up. I said ok.

8         Later that day, about 15 minutes after I returned my smoke break, Eiley told me that I

9  needed to go to Cheryl's office. Eiley walked with me into Cheryl's office. Only the three of

10  us were present. Cheryl told me that I was only allowed two ten-minute breaks. I recall Eiley

11  saying that if I don't use it all, I lose it all. I do not recall receiving a written warning at this

12  meeting. I do not kow if I was written up for this incident. This meeting lasted five minutes.

13  The door to the office was open during this meeting.

14         Since May 5, 2010, I have not received any other discipline from Chino.

15  **Past Practice**

16         Before I was disciplined in May 1, 2010, there was an understanding that you had until

17  7:07 a.m. to clock in for the morning shift before you were considered tardy. I do not recall

18  specifically who told me about this policy. I believe that we were also able to clock in 7

19  minutes before the beginning of our shifts too.

20         Prior to May 5, 2010, I had never had any problem stepping out to have a quick smoke

21  during my shift. I would always check to make sure it wasn't too busy and then would notify

22  the charge nurse or float nurse that I would be stepping outside for a minute. Sometimes

23  before May 5, 2010 I would step out more than two times a day to smoke for under 10 minutes

24  each time. Sometimes I would go outside to smoke with Carlos, the former Nurse Manager.

25  **Past Discipline**

I have carefully and completely read and understand the contents of this page: _____

**Exhibit 3**
**Page 60 of 402**

1    Before May 1, 2010, I recall being written up for tardiness in around October 2009. I

2    think on that occasion I had been written up by Carlos Gonzalez, the former Nurse Manager in

3    the ER, for three occasions on one time card when I had clocked in at around 7:02, 7:03 and

4    7:09 or 7:10. When Carlos was the nurse manager he frequently told me that I needed to be on

5    time and threatened to write me up but the only discipline I am aware of receiving for being

6    tardy was in about October 2009 and May 1, 2010. Other than what I have described in this

7    statement, I am not aware of any other discipline that Chino issued to me.

8    I do not recall ever receiving an employee handbook from Prime Healthcare but I

9    believe that I had received MOX messages (this are internal emails we receive at work) saying

10   that I could view the handbook online. I do not recall ever signing anything to indicate that I

11   had received a copy of an employee handbook.

12   <u>**Chill**</u>

13   After the election, I have heard coworkers say that if they had known it was going to be

14   this bad they would not have voted for the union.

15   **I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this**
16   **affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately**
17   **notify the Board Agent. I understand that this affidavit is a confidential law enforcement record and**
18   **should not be shown to any person other than my attorney or other person representing me in this**
19   **proceeding.**
20
21   **I have read this statement consisting of  5  pages, including this page, I fully understand its contents,**
22   **and I certify that it is true and correct to the best of my knowledge and belief.**
23
24                                                  _Helen D. Kibbler._
25                                                  Helen Kibbler (Signature of Witness)

26   Subscribed and Sworn Before Me at
27   Los Angeles, June 3, 2010
28
29   _Joanna Silverman_
30   Joanna Silverman, Board Agent
31   National Labor Relations Board

I have carefully and completely read and understand the contents of this page: ___

**PRIME HEALTHCARE SERVICES, INC.**

## PERFORMANCE IMPROVEMENT PLAN

Name: *Kibbler, Helen*  Position: *Registered Nurse*  Date: *5-1-10*  Dept: *Emergency*

This notice is being issued to call your attention to the following deficiencies in your job performance

| Type of Action | ☒ Verbal Warning  ☐ Notice of Disciplinary Suspension ____ days from ____ to ____ <br> ☐ Written Warning  ☐ Notice of Investigatory Suspension ____ days from ____ to ____ <br> ☐ Final Written Warning  ☐ Termination Date: ____ |
|---|---|
| Reason for Action | Explain the nature of performance deficiency and/or unacceptable behavior and how it affects the Department <br> *Not fulling essential Job functions* |
| Facts and Events | State the facts leading to this action --- be specific ( second page may be required) <br> *Tardiness to work, not ready to recieve report at 7:00 am. Showed up at 0730 am. 5-1-10 Did not clock out on 4-30-10 or clock for lunch.* |
| Previous Action | Has the employee been counseled or received counseling action for the same or similar reasons? <br> Yes ☐  ☐ No <br> If yes, what type: _____  Date Action was taken: _____ <br> Documented? ☐ Yes ☐ No |
| Performance Improvement Plan | State the accepted minimum standards of performance and corrective action steps which must be met by the employee: <br> *No more than 2 times tardy in a one month period.* |
| Improvement Period | Indicate the maximum amount of time allowed for improvement |
| Further Action To Be Taken | Continued failure to meet the minimum standards of the job may result in the following disciplinary action <br> *may lead to further disiplinary action up to termination.* |

Employees Comment: *I clocked @ 0730. my vehicle experienced a flat tire on my way to work, witnessed by security, photos ...*

Your signature is not an acknowledgement of fault, but a receipt of notice only

Employee Signature: *Helen H Kibbler, RN*  Date: *05.01.10 0814*

Supervisors: *D Williott RN*  Date: *5-1-10*

Witness: *D Rugga CNO - RN MSN FNP*  Human Resources: _____

*Attachment 1*

**Exhibit 3**
**Page 62 of 402**

TM410E

**PHS Chino Valley Med Ctr**
**Associate -- Time Card for Pay Period 09 - 04/18/10**
MAY 1 2010 at 07:43

Page: 1

# 80122   Helen  Kibbler -- 702.70100

| Day | In | Out | Amount | Pay Description | Department | JobCode |
|---|---|---|---|---|---|---|
| Wed-28 | 09:17 | 12:39 | 3.40 | | 702.70100 | 250 |
| Wed-28 | 13:14 | 19:31 | 6:30 | | 702.70100 | 250 |
| Fri-30 | 07:00 | @Wrk | | | 702.70100 | 250 |

## Pay Period Summary

| Totals | Pay Period | Week1 | Week2 | Prior Period |
|---|---|---|---|---|
| Regular | 9.70 | 0.00 | 9.70 | 0.00 |
| * * Productive * * | 9.70 | 0.00 | 9.70 | 0.00 |

| Totals for Week2 | Sun-25 | Mon-26 | Tue-27 | Wed-28 | Thu-29 | Fri-30 | Sat-01 |
|---|---|---|---|---|---|---|---|
| Regular | 0.00 | 0.00 | 0.00 | 9.70 | 0.00 | 0.00 | 0.00 |

| Accrual Description | Bank | Requested | Available |
|---|---|---|---|
| Holiday | 4.00 | 0.00 | 4.00 |
| Sick | 3.00 | 0.00 | 3.00 |
| Vacation | 39.00 | 0.00 | 39.00 |

### Time Approval

Time Card approved by

Exhibit 3
Page 63 of 402

| CHINO VALLEY MEDICAL CENTER | | Page(s): | 1 of 3 |
| | | Saved As: | CVMC 400.402 |
| **DEPARTMENTAL POLICIES AND PROCEDURES** | | | |
| Subject: | **ATTENDANCE STANDARDS** | Formulated: | **12/06** |
| Manual: | **HUMAN RESOURCES** | Reviewed: | **1/07, 6/07** |
| **Governing Board Approval** | Date: | Revised: | |

**PURPOSE:**

Regular attendance and punctuality are expected from all employees, and are an essential requirement of employment, as regular attendance is imperative for optimal patient care.   All employees are responsible for notifying their supervisor concerning absences and/or tardiness regardless of the reason.  Further each department is responsible for monitoring attendance, based upon established job attendance criteria.  The purpose of this policy is to ensure prior notification to supervisors of absences and/or tardiness by the employee to minimize disruption of work schedules, to allow for management planning of schedules, and to maximize efficiency and productivity within the department.  Generally employees that are going to be tardy for work or who will be unable to work their scheduled shift are required to call a minimum of two (2) hours prior to the start of the shift.

**SCOPE:**

All Employees

**POLICY:**

1.   The employee is responsible reporting all absences from work to his/her supervisor or the supervisor's designee, in accordance with department policy.

2.   An absence is any time you are scheduled for work and are unable to report.  This does not include approved time off for vacation, holiday, bereavement leave, jury duty, leaves of absence, or company-initiated time off.

3.   Tardiness is anytime you arrive late at your work station and/or are not dressed appropriately and ready to work at the start of your shift.

**PROCEDURE:**

1.   The employee is responsible for reporting to the supervisor the reasons for the unscheduled absence.  Any change in work schedule including, but not limited to, early departures from work, deviation in meal/break schedules, or overtime, must be approved in advance by the supervisor.

2.   If an employees is absent from work for more than one (1) unscheduled day, the employee must telephone and speak with the employee's supervisor each day of the absence unless a date for return was approved by the supervisor in advance.

**Exhibit 3**
**Page 64 of 402**

| CHINO VALLEY MEDICAL CENTER | | Page(s): | 2 of 3 |
|---|---|---|---|
| | | Saved As: | CVMC 400.402 |
| **DEPARTMENTAL POLICIES AND PROCEDURES** | | | |
| **Subject:** | **ATTENDANCE STANDARDS** | Formulated: | 12/06 |
| **Manual:** | **HUMAN RESOURCES** | Reviewed: | 1/07, 6/07 |
| **Governing Board Approval** | Date: | Revised: | |

Unreported absence of (2) consecutive scheduled work days constitutes job abandonment and a voluntary resignation as of the first day of the unreported absence.

3.   Simple notification of the employee's supervisor that the employee will be absent or tardy does not mean that the absence or tardiness is excused. An absence or tardiness will be deemed excused only if the employee obtains the supervisor's approval. Excessive tardiness or absenteeism will result in disciplinary action, up to and including termination.

4.   When absences due to illness or injury extends beyond three (3) scheduled work days, a written physician's certification releasing the employee to return to work must be submitted to Human Resources.

5.   Employees should not assume that absenteeism is allowable because they have sufficient PTO available to cover all or part of their time off.

6.   Absences maybe considered excessive if they are:

   a. Two (2) or more occurrences in a 3 month period
   b. Unscheduled absences (occurrences) which take place in questionable pattern, for example, concurrently with days off, weekends or holidays.

   Considering all the facts and circumstances, it is found to be disruptive to the hospital's day-to-day business, co-workers and/or customers.

7.   The manager has the responsibility to counsel an employee any time a pattern of absence/tardiness starts to develop.

8.   Tardiness is excessive when an employee is late (2) or more times in a one month period. Repeated tardiness may lead to disciplinary action up to and including termination.

9.   When an employee exceeds above the standards, the following actions shall be taken:

   a. First Offense:
      Verbal counseling, to include review of attendance history
      Documentation of the verbal counseling and specific goals in keeping with the above standards

   b. Second Offense:

**Exhibit 3**
**Page 65 of 402**

| | Page(s): | 3 of 3 |
|---|---|---|
| **CHINO VALLEY** | **Saved As:** | |
| **MEDICAL CENTER** | | **CVMC 400.402** |
| **DEPARTMENTAL POLICIES AND PROCEDURES** | | |
| **Subject:**     **ATTENDANCE STANDARDS** | **Formulated:** | **12/06** |
| **Manual:**     **HUMAN RESOURCES** | **Reviewed:** | **1/07, 6/07** |
| **Governing Board Approval**    **Date:** | **Revised:** | |

Written warning to include a review of attendance history and noting past discussions regarding absenteeism or tardiness.
Set specific goals to aid the employee in adhering to the attendance standards

c. Third Offense:

Further instances of absenteeism or tardiness will result in further disciplinary action, up to and including disciplinary suspension without pay, change of employee status or termination.

10. Immediate Termination – Employees who are absent for two (2) consecutive scheduled workdays without notification to their supervisor will be considered a voluntary termination.

11. The employee must maintain satisfactory attendance for three (3) months from the last disciplinary action. If he/she fails to do so, counseling and/or disciplinary action, up to and including termination may occur

12. All employees with unscheduled absences due to illness of three (3) or more consecutive working days shall present a physician's statement prior to returning to work. The statement shall indicate if the employee is fit for duty.

Exhibit 3
Page 66 of 402

1   County of Los Angeles )                          Case Nos. 31-CA-29713 et al.
2                        ) SS
3   State of California   )

4                        **Confidential Witness Affidavit**

5   **I, Kathy Sackman, being first duly sworn upon my oath, hereby state as follows:**

6   **I have been given assurances by an agent of the National Labor Relations Board that this**
7   **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8   **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9   **Affidavit in connection with a formal proceeding.**

10  My business address is 955 Overland Court, Suite 150, San Dimas, CA 91773.

11  My business phone number is 909.599.8622.

12       I am currently the President of United Nurses Associations of California Union of

13  Health Care Professionals ("UNAC" or the "the Union"). I have held this position since 1978.

14  As President, I am the chief executive officer of the Union. I am at times involved in

15  bargaining and I oversee all of our organizing and representational activities. I became

16  involved in the organizing campaign of RNs employed at Chino Valley Medical Center

17  ("Chino Valley" or "the Employer") when my chief organizer told me that employees at Chino

18  were interested in being organized again (we had previously organized the nurses and had a

19  Board election in May 2008).

20       On or about April 9, 2010, I sent a letter to Chino Valley Medical Center's Chief Medical

21  Officer, Dr. James Lally. This letter is attached as Attachment 1 to this affidavit. I received a

22  response from Mary K. Schottmiller ("Schottmiller"), the Employer's counsel, dated April 14,

23  2010 on or about April 15, 2010. This letter is attached as Attachment 2 to this affidavit. On or

24  about May 10, 2010, I received a letter dated May 7, 2010 from Schottmiller about union access

25  to Chino Valley Medical Center. This letter is attached as Attachment 3 to this affidavit. On or

Page 1

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page: _____

**Exhibit 3**
**Page 67 of 402**

1  about May 11, 2010, I received a letter dated May 11, 2010 from UNAC in-house counsel Lisa

2  Demidovich to Schottmiller regarding union access and Weingarten rights. This letter is

3  attached as Attachment 4 to this affidavit.

4    I became aware of changes in the Employer's attendance/tardiness policies on or about

5  April 9, 2010 at a meeting at a Denny's in Chino attended by me, Lisa Demidovich, former

6  chief organizer Kyle Serrette, Executive Assistant Bill Rouse, Union representatives Olivia

7  Quijano and Thor Causing, and 12-13 Chino Valley RNs. At this meeting, the RNs present told

8  us that they were being told that the Employer was going to start implementing a tardiness

9  policy that the Employer had had but had not implemented. At this meeting, one of the nurses

10 told us that he had been counseled pursuant to the Employer's tardiness policy. Prior to April

11 9, 2010, the Employer had not given me notice or an opportunity to bargain regarding the

12 implementation/announcement of its tardiness policy. To date, the Employer has not given

13 me notice or an opportunity to bargain regarding this tardiness policy.

14

15 **I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this**
16 **affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately**
17 **notify the Board Agent. I understand that this affidavit is a confidential law enforcement record and**
18 **should not be shown to any person other than my attorney or other person representing me in this**
19 **proceeding.**

20 **I have read this statement consisting of  2  pages, including this page, I fully understand its contents,**
21 **and I certify that it is true and correct to the best of my knowledge and belief.**

22
23
24
25          _Kathy Sackman_ (Signature of Witness)
26 Subscribed and Sworn to Before Me by Telephone
27 Los Angeles, June 2, 2010
28
29
30  _Joanna Silverman_
31 Joanna Silverman, Board Agent
32 National Labor Relations Board

I have carefully and completely read and understand the contents of this page: _KJS_

**Exhibit 3**
**Page 68 of 402**

# UNAC/UHCP

**United Nurses Associations of California/Union of Health Care Professionals**

UNAC/UHCP is affiliated with NUHHCE, AFSCME and the AFL-CIO

955 Overland Court, Suite 150 San Dimas, CA 91773-1718
Telephone: (909) 599-8622
Fax: (909) 599-8655
Website: http://www.unac-ca.org

April 9, 2010

*VIA CERTIFIED MAIL*
James Lally, Chief Medical Officer
Chino Valley Medical Center
5451 Walnut Avenue
Chino, CA 91710

      Re:    Demand for Bargaining and Request for Information
               <u>for Registered Nurses Unit at Chino Valley Medical Center</u>

Dear Dr. Lally,

      Now that the Registered Nurses have voted for union representation, National Labor Relations Board law prohibits the Employer from making any unilateral changes to the employees' wage, hours, or other terms and conditions of employment after the date of the election without affording this Union an opportunity to bargain. Any such unilateral changes would become unfair labor practices subject to the issuance of the NLRB's certification of the election results.

      Thus, we insist that, henceforth, you honor your legal responsibility to make no unilateral changes with respect to the terms and conditions of employment of any employee in the bargaining unit without affording an opportunity to this Union to bargain over the decision and effects of any such change. The following is a list of those changes which we insist may not be made without bargaining over the decision and the effects. The list is not inclusive, but is simply illustrative of those changes.

1.    No changes should be made to any term or condition of employment between you and the bargaining unit employees;

2.    No promotional position should be filled without bargaining;

3.    No employees should have their hours changed without bargaining;

4.    No employee should be warned, counseled, disciplined or terminated without bargaining. Indeed, no discipline should be imposed without affording the employee his Weingarten rights, which we hereby demand;

Attachment 1         1085

**Exhibit 3**
**Page 69 of 402**

Bargaining Demand & Information Request
April 9, 2010
Page 2

5.  No one should be hired without bargaining over the person who should fill the position;

6.  No employee should be laid off without bargaining;

7.  No health and welfare, pension or other fringe benefits should be denied without bargaining;

8.  No positions outside the bargaining unit should be filled without bargaining over the question of transfer or promotion;

9.  No work location, assignment, classification or any other aspect of employment should be changed without bargaining;

10.  No changes in the method and manner by which work is being performed may be made without bargaining;

11.  No introduction of any new work techniques without bargaining; and

12.  No subcontracting or any changes in the workplace should be made without bargaining.

We demand that if there are any wage increases or benefit increases which would have normally occurred without the Union, those should be implemented in the normal course of business. We insist, however, on being notified in advance of any such changes so that we can bargain over those changes. Although included in the bargaining will be most likely a demand that the wage increases or other benefit changes be better than otherwise proposed, NLRB law requires the regular increase be put into place and that you afford the Union a chance to bargain over those decisions as well as the effects of those decisions.

Finally, in order to commence bargaining over what will be our first collective bargaining agreement, we will need the following information:

1.  A list of current employees including their names, dates of hire and dates of hire as a Registered Nurse (if different), status (e.g., full-time, part-time, or per diem), current hourly wage rate (including hourly wage premiums and/or differentials), wage increases and type (equity, merit, etc.) over the last three years (including effective dates of increase); wage increases and type (equity, merit, etc.) over the last five years (including effective dates of increase); fringe benefits (type, amount, and dates of receipt), job classifications, shifts (including shift length by hours), last known home addresses, and phone numbers;

2.  A copy of all written company personnel policies and/or procedures currently in effect, including the Employee Handbook;

Exhibit 3
Page 70 of 402

Bargaining Demand & Information Request
April 9, 2010
Page 3

3.    A written statement of all company policies and/or procedures other than those
      mentioned in Number 2 above;

4.    A copy of all company fringe benefit plans including pension, 401(k), profit sharing,
      stock incentive, health and welfare, training, legal services, child care or any other plans
      which relate to the employees;

5.    Copies of all current job descriptions for all bargaining unit positions;

6.    Copies of all practices, procedures and methods, utilized in order to determine the
      amount and distribution of pay, wage and/or other remuneration to bargaining unit
      employees.

7.    Copies of any charges and/or complaints against the Employer by bargaining unit
      employees filed under state and/or federal fair employment practice laws.  This
      information is necessary in order that the Union can determine what employment related
      issues are of concern to bargaining unit employees, and in what ways the Employer has
      worked to the detriment of bargaining unit employees' interests.  With this information
      the Union can bargain for necessary changes and protections within the framework of the
      collective bargaining agreement;

8.    The following information related to all benefit plans which bargaining unit employees
      are either a participant of and/or have the option of participating in.  Benefit plans
      include, but are not limited to, medical, dental, AD&D, long term disability, group life,
      dependent life, flexible spending accounts, and pension plan 401(K).

      (a)    The number of bargaining unit employees enrolled in each plan.

      (b)    The dollar amount of any mandatory employee contributions to each plan.

      (c)    Plan document.

      (d)    Any trust agreement related to each plan.

      (e)    The latest Summary Plan for each plan with all amendments.

      (f)    Any rules/regulations governing the operation of each plan not included above.

      (g)    The last three 5500s filed with the Federal Government.

      (h)    The last three audited financial statements.

      (i)    The last three actuarial reports, if any.

      (j)    The last three Summary Annual Reports distributed to plan participants.

Exhibit 3
Page 71 of 402

Bargaining Demand & Information Request
April 9, 2010
Page 4

    (k)    The last three Summary of Material Modifications distributed to participants.

    (l)    Any contracts between the plan and any third party including, but not limited to, insurance contracts and contracts with custodians of assets and investment managers.

    (m)    Any policies adopted by the fiduciaries of the plan, including but not limited to, any investment policy, trustee expense policy, cost sharing policy, and funding policy.

    (n)    Any insurance policy and/or bonding policy covering the plan and its fiduciaries.

    (o)    Last Internal Revenue Service determination of the tax qualification for the plan.

    (p)    Any document which shows the current assets of each plan including a description of those assets.

    (q)    Copies of all claims for coverage under the plan made by bargaining unit employees during the last five years as well as copies of any correspondence or other documents with respect to the processing of those claims and the payments of those claims; and

    (r)    The name, address and principal contact of the office which administers each plan.

9.    The total sick leave usage of bargaining unit employees for the past 24 month period.

10.    The total number of canceled shifts (low census days) for bargaining unit employees for the past 24 month period.

11.    The total number of involuntary overtime hours imposed on bargaining unit employees for the past 24 month period.

12.    The total costs of benefits (benefit plans include, but are not limited to, medical, dental, AD&D, long term disability, group life, dependent life, flexible spending accounts, and pension plan 401(K)) for bargaining unit employees for the past 24 month period.

13.    The average costs of benefits (benefit plans include, but are not limited to, medical, dental, AD&D, long term disability, group life, dependent life, flexible spending accounts, and pension plan 401(K)) per bargaining unit employee each month for the past 24 month period.

14.    With respect to bargaining unit members, copies of all disciplinary notices, warnings, or records of disciplinary personnel actions for the last year.

Exhibit 3
Page 72 of 402

Bargaining Demand & Information Request
April 9, 2010
Page 5

15. Copies of all collective bargaining agreements which are currently in effect between this Employer and any union and copies of all collective bargaining agreements between this employer and any union which have expired at any time during the last five years.

**We are concerned in bargaining with respect to any possibility that our members will be charged with any civil penalty or criminal offense arising out of the performance of their duties. For purposes of bargaining over working conditions that will prevent such charges against our members or protect them in the event such charges are brought we are asking you to provide the following information:**

16. A list of all local, state and federal laws, statutes or ordinance which you believe govern the operation of your business.

17. A list of all notices which you have posted at your work locations which notices are required by any state or federal law.

18. Copies of all citation, indictments, criminal charges, information, other documents reflecting any charges by any public agency or authority under any criminal or civil statute against the Employer for the last five years. For each such document, please provide a complete copy of the document reflecting the charges, and any document which reflects the disposition of said charges.

19. Copies of all citation, indictments, criminal charges, information, other documents reflecting any charges by any public agency or authority under any criminal or civil statute against the Employer for the last three years. For each such document, please provide a complete copy of the document reflecting the charges, and any document which reflects the disposition of said charges.

20. A copy of all company policies which concern, mention or relate to any of the laws, ordinances or statutes referred to in request number 49.

21. A list of all employees who were, in any way, involved in the charges or citations mentioned above. For any employee who was alleged to have committed or accused of any wrong doing, please provide the nature of the alleged wrongdoing and the nature of any discipline, if any, which was imposed upon said employee.

22. A copy of all inquiries from any public official concerning the operation of the business where that inquiry concerned any matter with civil or criminal penalties attached to the operations of the business. Included should be a copy of the company's response is any.

23. Copies of all public liability policies currently in effect including the amount of premium paid for such policies.

**Exhibit 3**
**Page 73 of 402**

Bargaining Demand & Information Request
April 9, 2010
Page 6

**Our members are concerned with respect to whether they will be disciplined under any circumstances where the Employer has knowledge that they have committed any criminal offense. Note that information regarding employees outside the bargaining unit is relevant to determine the Employer's practice and to insure that there is no discriminatory treatment of bargaining unit members. For purposes of evaluating this, we are asking you to provide the following information:**

24. List the names of all employees whom to the Employer's knowledge have been charged with or convicted of any criminal offense no matter how minor (Whether misdemeanor, infraction, felony or otherwise).

25. For each employee charged or convicted, please provide the name of the employee, the date upon which the employee was charged or convicted or said offense, the results of the criminal proceeding, any action, if any, taken by the Employer. This information should be provided for the last five years.

26. For each employee charged or convicted, please provide the name of the employee, the date upon which the employee was charged or convicted or said offense, the results of the criminal proceeding, any action, if any, taken by the Employer. This information should be provided for the last three years.

27. Copies of all disciplinary notices, warnings or records of disciplinary personnel actions for the last year.

**Our members are interested in their right to promotion both within the bargaining unit as well as to promotion from positions within the bargaining unit to positions outside the bargaining unit. For purposes of this bargaining we need the following information:**

28. A list of all employees who have been promoted either to classifications in the bargaining unit or from classifications within the bargaining unit to positions outside the bargaining unit, the classification to which they were promoted, the date of the promotion, the pay rate when promoted, the pay rate of the promotion, and the reason or reasons for the promotion.

29. With respect to all positions which have been filled by hiring from the outside please state the date an opening occurred, the nature of the position, the pay rate and the reason or reasons individuals were hired from the outside rather than promoting from within.

30. With respect to all employees who have been denied a promotion within the last five years please give the name of the employee, the date of the denial of the promotion and the reason or reasons the person was denied a promotion.

**Exhibit 3
Page 74 of 402**

Bargaining Demand & Information Request
April 9, 2010
Page 7

**Our members are interested in having training programs so that they may perform their current tasks better and/or be trained for better positions. For such bargaining we are asking that you provide the following information:**

31. A copy of any and all company training programs.

32. The names of all employees who have been involved in any training program during the last five years with the date or dates of such training program, a description of the training program and the name of the individuals conducting the training program.

33. Please provide the names of all employees who have asked to be trained but have been denied any training during the last five years with the dates of the denial and reason for the denial.

**Our members are interested in having a fair and equitable leave policy whether those leaves are for short or long periods. Such leaves may be for many purposes including funeral, further study, travel, maternity, paternity, family obligations, adoption, illness or recreation. For purposes of bargaining over such an issue we ask that you provide the following information:**

34. A copy of all company leave policies.

35. A list of all bargaining unit employees who have taken leave for any period of time for any purpose within the last five years. For each employee give the name of the employee, the date the leave began, the date the leave ended, and the reason for the leave.

36. With respect to any bargaining unit employee who has been denied any leave for the last five years please give the name of the employee, the date the employee was denied leave and the reason or reasons that the employee was denied such leave.

**Our members are concerned about the possibility of job and benefit loss should the company be restructured, sold or taken over. In order to bargain over such issues we need the following information:**

37. A copy of the bylaws and articles of incorporation.

38. A list of the current shareholders showing the amount of shares and class of shares owned.

*KS*

**Exhibit 3**
**Page 75 of 402**

Bargaining Demand & Information Request
April 9, 2010
Page 8

39.  Financial statements for the last five years.

40.  Copies of all correspondence which concern the possibility of restructuring, sale and/or takeover of the company for the last five years.

**To the extent that there is a cafeteria or vending machines, the price of food impacts our members. We are, therefore, asking that you provide the following:**

41.  A complete list of all food items which are available for sale to employees from vending machines or an employee cafeteria. That list should include all items which have been sold in the last year as well as the price.

**The Americans with Disabilities Act ("ADA") imposes obligations on the employer to accommodate disabilities. Obligations are likewise placed on the Union with respect to accommodating those disabilities where there is a collective bargaining agreement or collective bargaining relationship. For purpose of bargaining over the implementation of any procedures or policies with respect to the ADA, we are requesting the following:**

42.  Copies of all employment applications currently used.

43.  A description of all medical tests required of all applicants and employees.

44.  A list of all employees who have been accommodated during the last five years for any physical or mental disability or handicap. For each such person please give the employees' name, a description of the disability, a description of the accommodation and a statement of the estimated cost to the company of accommodating that individual.

45.  A list of all employees who have not been accommodated during the last five years for any physical or mental disability or handicap. For each such person please give the employees' name, a description of the disability, a description of the reason why no accommodation was made for the disability and a statement of the estimated cost to the company had it accommodated the disability, of accommodating that individual.

46.  A list of all jobs that have been restructured in the last five years describing each restructuring that has occurred and the reasons for the restructuring.

47.  A copy of any charges filed with any state or federal agency in the last five years alleging handicap or physical or mental disability discrimination.

**Exhibit 3**
**Page 76 of 402**

Bargaining Demand & Information Request
April 9, 2010
Page 9

Please consider this letter to be a continuing demand for the information set forth above.

Once we have received this information, we will call you to arrange a mutually convenient date, time and place to begin bargaining. Given that bargaining cannot commence until the information has been provided, your prompt attention to these requests will be greatly appreciated.

Very truly yours,

Kathy J. Sackman, RN

KJS/rr

cc:    Mary Schottmiller

Exhibit 3
Page 77 of 402



# CHINO VALLEY
# MEDICAL CENTER
*A Prime Healthcare Services Hospital*

April 14, 2010

Kathy Sackman, RN
UNAC/UHCP
955 Overland Court, Suite 150
San Dimas, CA 91773-1718

Re:   Demand for Bargaining and Request for Information
       For Registered Nurses Unit at Chino Valley Medical Center

Dear Kathy:

We are in receipt of your letter dated April 9, 2010 demanding bargaining and requesting information. As you are aware, we filed objections with the National Labor Relations Board on April 9, 2010 alleging numerous objections to the election. As such, until we receive a valid certification of the election, we will not produce the documents requested nor agree to bargain at this time.

If you have any questions, feel free to contact me.

Very truly yours,

Mary K. Schottmiller
Assistant General Counsel
Chino Valley Medical Center

Attachment 2

Exhibit 3
Page 78 of 402



## CHINO VALLEY MEDICAL CENTER
*A Prime Healthcare Services Hospital*



May 7, 2010

Kathy Sackman, RN
UNAC/UHCP
955 Overland Court, Suite 150
San Dimas, CA 91773-1718

Re: Inappropriate conduct by UNAC representative

Dear Kathy:

This is to advise you of a troubling incident that occurred at our medical center earlier this week and UNAC's apparent misunderstanding of its lack of rights as an uncertified union.

On May 6, Minerva, one of your representatives, came onto our property and demanded to "challenge" management's decision to discipline Ronald Magsino. In the process, she threatened our CNO, Linda Ruggio, when she stated, "you do know what is going to happen to you now, don't you?" First, I must remind you that your union has no contractual rights of access to our property. If you choose to have another union representative enter our property without authorization from Dr. James Lally, Chief Medical Officer, we will again call security and have that person escorted off the property or call the police if necessary.
In the event UNAC ever does obtain contractual access rights to our property, Minerva is banned from our property.

Second, an employee has no rights to have a union representative challenge any disciplinary decision made by management. As I'm sure you are aware, Weingarten rights only apply to investigatory interviews, nothing more. If an employee wants to appeal a decision made by management, he can go through the appeal process instituted at our medical center. Please educate your representatives of the law to avoid further incidents.

Very truly yours,

Mary K. Schottmiller
Assistant General Counsel
Chino Valley Medical Center

cc: Dr. Lally
    Linda Ruggio
    Chino Valley Medical Center employees



# UNAC/UHCP

**United Nurses Associations of California/Union of Health Care Professionals**

UNAC/UHCP is affiliated with NUHHCE, AFSCME and the AFL-CIO

955 Overland Court, Suite 150 San Dimas, CA 91773-1718
Telephone: (909) 599-8622
Fax: (909) 599-8655
Website: http://www.unac-ca.org

May 11, 2010

**Via E-Mail & U.S. Mail**
Mary K. Schottmiller
Prime Healthcare Management, Inc.
3300 East Guasti Road
Ontario, California 91761

        Re:    Chino Valley Medical Center and Weingarten Violations

Dear Mary:

        This letter is to inform you that UNAC/UHCP believes Chino Valley Medical Center
("CVMC") violated the Weingarten rights of several Registered Nurses ("RNs") last week. "An
employer violates Section 8(a)(1) of the [National Labor Relations Act ("Act")] by proceeding
with an investigatory interview without the union representative, after the employee has
requested union representation, **even if a fellow employee monitors the interview as a
witness.**" DEVELOPING LABOR LAW at 232-33 (5th ed. 2006) (emphasis supplied) (citing
*Williams Pipeline Co.*, 315 N.L.R.B. 1, 5 (1994) (The Board stated: "[A]n employee's 'right to
representation' in an investigatory interview is an employees' right to a representative who is an
agent of the labor organization.")).

        UNAC/UHCP believes CVMC violated Section 8(a)(1) of the Act when Chief Nursing
Officer Linda Ruggio refused to allow UNAC/UHCP staff representative Minerva Aller-dela
Fuente RN to serve as a union representative when she arrived on Thursday, May 6 at 8:00 a.m.
to a meeting that an RN believed could result in discipline. Instead of allowing Ms. Aller-dela
Fuente to attend the meeting, she was instructed that UNAC/UHCP staff is not allowed on
Hospital premises for any reason, suggesting that any UNAC/UHCP staff person's presence
would be regarded as trespassing. Not only was Ms. Aller-dela Fuente not trespassing for the
reasons discussed below, but her timely presence could not be lawfully denied at an investigatory
interview under the Act. In your May 7, 2010 letter sent to UNAC/UHCP President Kathy
Sackman, Dr. Lally, Linda Ruggio, and all Chino Valley Medical Center employees, you
misrepresented the facts by stating Ms. Aller-dela Fuente "threatened" CNO Ruggio. Ms. Aller-
dela Fuente is a very experienced union staff representative who always acts professional and
appropriate when representing members as you know from your positive interaction with her at
Garden Grove Hospital & Medical Center. Ms. Aller-dela Fuente is extremely experienced in
representing employees who have invoked their Weingarten rights. She arrived at CVMC to
represent an employee at an investigatory interview, and could not have "demanded to
'challenge' management's decision to discipline" an employee as you incorrectly asserted in

Attachment 4

Exhibit 3
Page 80 of 402

Weingarten Violations
May 11, 2010
Page 2

your May 7 letter; in fact, it would have been impossible for her to challenge discipline that she had not even heard of until days later.

Mischaracterizing Ms. Aller-dela Fuente's statement—that UNAC/UHCP would take appropriate action in response to being told she was not allowed to be present to serve as a union representative in investigatory interviews—as a threat was inaccurate, inappropriate, and likely libelous to publish such a statement to degrade her reputation to all CVMC employees, almost all of whom have never met Ms. Aller-dela Fuente. It is obvious from the face of your letter that Ms. Aller-dela Fuente's misquoted statement was merely to inform CNO Ruggio that UNAC/UHCP would appropriately respond. In fact, UNAC/UHCP filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") regarding this incident on Friday, May 7. We have filed numerous other unfair labor practice charges with the National Labor Relations Board to remedy what we believe the NLRB will deem as federal labor law violations. We will continue to file charges for each violation brought to our attention, particularly interference with RNs' Section 7 rights to engage in concerted activity with other RNs for their mutual aid and protection. We are also evaluating filing a defamation lawsuit in court for this and other untrue factual statements made about UNAC/UHCP and its staff, before and after the election, in an effort to damage our excellent reputation in the community.

As to trespassing, Union agents engaging in lawful union activity are expressly exempt from California trespass law. Penal Code section 602(o) provides that trespass does not apply to union agents, like Ms. Aller-dela Fuente, conducting "lawful labor union activities." In response to your written comment that you will have security escort UNAC/UHCP representatives off the property or call the police, the Chino Police Department confirmed yesterday that Penal Code section 602(o)'s exemption would be applied to UNAC/UHCP representatives visiting CVMC for representational purposes. Chino Police Department further confirmed that under its policy, union presence for representational activities is a civil matter because of section 602(o)'s exemption and it will not arrest union representatives for trespassing under such circumstances. Chino Police Department's policy is supported by California's highest court, which has instructed that applying trespass laws to union agents on private property—even after a trespass warning is given—is "illogical and inconsistent with the view consistently expressed by the Legislature and th[e California Supreme C]ourt: that general trespass statutes may not be used to frustrate legitimate union activities on private premises." *In re Catalano*, 29 Cal. 3d 1, 10 (1981) (emphasis supplied).

CVMC may not discriminate against the union regarding access to CVMC. Because CVMC admittedly "permits . . . outside organizations to use its facilities to solicit" and has recognized Union access rights in the past, *see* CVMC counsel William Emanuel's April 23, 2008 letter to UNAC/UHCP counsel, UNAC/UHCP has filed a separate unfair labor practice charge with the NLRB alleging CVMC violated the Act when it banned Ms. Aller-dela Fuente on May 6 and announced a permanent ban to all CVMC employees in your May 7 letter.

Finally, you sent your May 7, 2010 letter directly to UNAC/UHCP President Kathy J. Sackman RN, on which I was not copied, even though you know that I am the in-house attorney at UNAC/UHCP—and represent it for all purposes—from my work with you at CVMC and

**Exhibit 3**
**Page 81 of 402**

Weingarten Violations
May 11, 2010
Page 3

Garden Grove Hospital & Medical Center. *See* California Rules of Professional Conduct 2-100(A) ("While representing a client, a [California Bar] member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."). I have never given my consent for you to contact any UNAC/UHCP officer or agent directly about union representational matters at CVMC. Please honor your ethical duties by **not** communicating with any UNAC/UHCP officers or agents—directly or indirectly—about union representational matters at CVMC again without my express consent.

Thank you for your anticipated prompt attention to the concerns addressed herein.

Very truly yours,

Lisa C. Demidovich, Esq.

LCD/rr

cc:     Kathy J. Sackman RN (via e-mail only)
        Bill Rouse (via e-mail only)
        Chino Valley Medical Center RNs (via U.S. mail only)

**Exhibit 3**
**Page 82 of 402**

1    County of Los Angeles )                              Case Nos. 31-CA-29713 et al.
2                         ) SS
3    State of California   )

4                          **Confidential Witness Affidavit**

5    **I, Kathy Sackman, being first duly sworn upon my oath, hereby state as follows:**

6    **I have been given assurances by an agent of the National Labor Relations Board that this**
7    **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8    **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9    **Affidavit in connection with a formal proceeding.**

10   My business address is 955 Overland Court, Suite 150, San Dimas, CA 91773.

11   My business phone number is 909.599.8622.

12          Please see my June 2, 2010 affidavit for my background information.

13          Within the last couple of weeks, I found out from union representatives that the

14   Employer had changed how it was reimbursing employees for certification classes they attend.

15   I am currently not aware of the details of how the Employer has changed its reimbursement

16   policy.  The Employer did not give me notice or an opportunity to bargain over this change.

17   **I am being provided a copy of this Confidential Witness Affidavit for my review.  If, after reviewing this**
18   **affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately**
19   **notify the Board Agent.  I understand that this affidavit is a confidential law enforcement record and**
20   **should not be shown to any person other than my attorney or other person representing me in this**
21   **proceeding.**

22   **I have read this statement consisting of _1_ page, including this page, I fully understand its contents,**
23   **and I certify that it is true and correct to the best of my knowledge and belief.**

24
25
26                                              Kathy Sackman (Signature of Witness)
27   Subscribed and Sworn to Before Me by Telephone
28   Los Angeles, June 10, 2010
29
30
31   Joanna Silverman, Board Agent
32   National Labor Relations Board

                                    Page 1

                          **PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.  The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation.  The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006)  The NLRB will further explain these uses upon request.  Disclosure of this information to the NLRB is voluntary.  However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page: _KS_

**Exhibit 3**
**Page 83 of 402**

| | | |
|---|---|---|
| 1 | County of Los Angeles ) | Case Nos. 31-CA-29713 et al. |
| 2 | ) SS | |
| 3 | State of California ) | |

4 **Confidential Witness Affidavit**

5 **I, Kathy Sackman, being first duly sworn upon my oath, hereby state as follows:**

6 **I have been given assurances by an agent of the National Labor Relations Board that this**
7 **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8 **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9 **Affidavit in connection with a formal proceeding.**

10 My business address is 955 Overland Court, Suite 150, San Dimas, CA 91773.

11 My business phone number is 909.599.8622.

12      Please see my June 2, 2010 affidavit for my background information.

13      The Employer did not give me notice or an opportunity to bargain over the change in its

14 policy on attendance at mandatory meetings. I first heard of this change when I attended a

15 meeting with nurses at Denny's on April 9, 2010 when one of the nurses, ___ Lina ("Lina"),

16 came up to me and told me that she had heard that she was going to be disciplined for not

17 attending a staff meeting. I asked if the meeting was mandatory. Lina said that they are

18 supposed to go but that she had missed them in the past because of her other job or class that

19 she attends and that she had not been disciplined before. Later, I heard from the union

20 representative Olivia Quijano ("Olivia") that Lina had been disciplined for missing the

21 mandatory meeting.

22      Also, at the April 9, 2010 meeting at Denny's, I heard from one of our nurses that she

23 had tried to change her schedule and her supervisor told her she could not make the change.

24 The nurse told me that she responded to her supervisor that she always been allowed to

25 change her schedule and, in that case, her supervisor ultimately let her change her schedule. A

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page: _KS_

**Exhibit 3**
**Page 84 of 402**

1   couple of weeks later, I heard from Olivia that the Employer told nurses that they could not

2   change their schedules once they are posted.  The Employer did not give me notice or an

3   opportunity to bargain over this change in its policy covering the switching of shifts.

4   **I am being provided a copy of this Confidential Witness Affidavit for my review.  If, after reviewing this**
5   **affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately**
6   **notify the Board Agent.  I understand that this affidavit is a confidential law enforcement record and**
7   **should not be shown to any person other than my attorney or other person representing me in this**
8   **proceeding.**

9   **I have read this statement consisting of _2_ pages, including this page, I fully understand its contents,**
10  **and I certify that it is true and correct to the best of my knowledge and belief.**

11
12
13                                              Kathy Sackman (Signature of Witness)
14   Subscribed and Sworn to Before Me by Telephone
15   Los Angeles, July 20, 2010
16
17
18   Joanna Silverman, Board Agent
19   National Labor Relations Board

I have carefully and completely read and understand the contents of this page: _KS_

Page 2 of 2

**Exhibit 3**
**Page 85 of 402**

| | |
|---|---|
| 1  County of Los Angeles  ) | Case Nos. 31-CA-29713 et al. |
| 2                    ) SS | |
| 3  State of California    ) | |

4                    **Confidential Witness Affidavit**

5  **I, Kathy Sackman, being first duly sworn upon my oath, hereby state as follows:**

6  **I have been given assurances by an agent of the National Labor Relations Board that this**
7  **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8  **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9  **Affidavit in connection with a formal proceeding.**

10  My business address is 955 Overland Court, Suite 150, San Dimas, CA 91773.

11  My business phone number is 909.599.8622.

12        Please see my June 2, 2010 affidavit for my background information and for my

13  testimony about the Union's request for bargaining and information request.  Since my receipt

14  of the Employer's letter dated April 14, 2010, the Employer has not responded to the Union's

15  April 9, 2010 information request or request to bargain.  Since my April 9, 2010, I have not,

16  verbally or in writing, requested that the Employer provide the Union with information or

17  bargain with the Union.

18  **I am being provided a copy of this Confidential Witness Affidavit for my review.  If, after reviewing this**
19  **affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately**
20  **notify the Board Agent.  I understand that this affidavit is a confidential law enforcement record and**
21  **should not be shown to any person other than my attorney or other person representing me in this**
22  **proceeding.**

23  **I have read this statement consisting of _1_ page, including this page, I fully understand its contents,**
24  **and I certify that it is true and correct to the best of my knowledge and belief.**

25
26
27                              *Kathy Sackman*
                              Kathy Sackman (Signature of Witness)

28  Subscribed and Sworn to Before Me by Telephone
29  Los Angeles, September 23, 2010
30
31  *Joanna Silverman*
32  Joanna Silverman, Board Agent
33  National Labor Relations Board

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.  The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation.  The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  The NLRB will further explain these uses upon request.  Disclosure of this information to the NLRB is voluntary.  However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page: _KJS_

**Exhibit 3**
**Page 86 of 402**

| 1 | County of Los Angeles ) | Case Nos. 31-CA-29713 et al. |
| 2 | ) SS | |
| 3 | State of California ) | |

4 **Confidential Witness Affidavit**

5 **I, Ronald Magsino, being first duly sworn upon my oath, hereby state as follows:**

6 **I have been given assurances by an agent of the National Labor Relations Board that this**
7 **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8 **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9 **Affidavit in connection with a formal proceeding.**

10 My address is ████████████████████████████████████████.

11 My phone number is 818.687.9065.

12      I currently work for Chino Valley Medical Center ("Chino" or "the Employer") located

13 at 5451 Walnut Avenue, Chino, CA 91710 as a full-time staff nurse. I am a registered nurse. I

14 have held this position for about four years. I work three 12-hour shifts each week. I work the

15 dayshift which is from 7:00 a.m. to 7:30 p.m. For the last month and a half I have worked at

16 least one day a week of overtime. The days that I work each week vary from week to week. I

17 earn about $35/hour. Chino is owned by Prime Healthcare. I receive health insurance from my

18 Employer. The Employer pays for my health insurance but I pay for my vision and dental

19 coverage. I work in the Emergency Department. There at least 20 registered nurses in the

20 emergency. I do not know the exact number. My direct supervisor is Cheryl Gilliat

21 ("Cheryl"). She is the ER manager.

22 **Union Activity**

23      UNAC ("UNAC" or "the Union") began organizing a unit of RNs at Chino Valley

24 during either the last week of October or the first week of November 2009. (UNAC also tried

25 to organize Chino employees in 2008 and lost the election.) I talked to co-workers about the

Page 1

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use
of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings
and related proceedings or litigation. The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43
(Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However,
failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may
cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page:  (M)  **Exhibit 3**
**Page 87 of 402**

1   Union. I collected authorization cards for the Union. I organized meetings to take place

2   outside of the hospital for employees to talk about the Union. The NLRB held an election for

3   the Union on April 1 and 2, 2010. After the election, I started wearing a UNAC pin on my

4   badge. The pin is about the size of a quarter. It has the UNAC logo on it. I wear my badge at

5   all times while I am working. I was also on flyers for the Union. I have marked the pictures of

6   me on the flyer with a check mark. There were two versions of the flyers. One is marked as

7   Attachment 1 and the other is marked as Attachment 2. Sometime before the election, I saw

8   these flyers sitting on a table in the ER breakroom.

9          On or about March 31, 2010, I was at work sitting at the nursing station when the CEO,

10   Dr. Lally, came up to me. He was holding a copy of one of the flyers I am pictured in and he

11   said to me that I was a movie star because I was in it three times. I smiled. Dr. Lally didn't say

12   anything else to me at this time. This conversation lasted a few seconds. I do not know if

13   anyone else was present when Dr. Lally spoke to me.

14          On April 5, 2010, Dr. Lally called me into Cheryl's office and said that he wanted to

15   congratulate me for being a gentleman about all of this. He said that he saw me at the

16   counting of the ballots and I was pretty quiet about the whole thing. Dr. Lally said that during

17   the whole campaign I was pretty professional about the whole thing and he appreciates me

18   prioritizing patient care above all things. I told Dr. Lally that I have nothing against them but

19   that we just have two different opinions. I said that they believe in something and I believe in

20   something else. I shook his hand and the meeting ended. This meeting lasted 1-2 minutes. I

21   was standing in the doorway during this conversation.

22          Within a week or two after the union election, after April 5, 2010, between 2-3 p.m., I

23   was finishing taking a call and was in the radio room. (As part of my job at Chino, I will

24   answer calls from paramedics responding to 911 calls. I have Mobile Intensive Care Nurse

25   certification to do this work. Not all nurses at Chino have this certification.) When I came out

26   of the radio room, Dr. Lally was there and said that he wanted to talk to me. We walked to the

I have carefully and completely read and understand the contents of this page: 

Page 2 of 15

**Exhibit 3**
**Page 88 of 402**

1    ambulance bay and Dr. Lally said that he was going to give me a warning. He said that I had
2    been totally good about the union thing but that he wanted to give me a warning because
3    "they're saying that Ronald Magsino has violated the solicitation policy." He did not explain
4    what he meant by "they." Dr. Lally said that they had seen me on a camera talking to a group
5    of nurses during work hours and they think that I am organizing something. I said "Dr. Lally,
6    that's . . . " Dr. Lally did not let me finish my sentence and said "I know it's crap but they are
7    making me do it." Dr. Lally said that the policy has been in place for a while now and that he
8    did not think that the union could protect me. Dr. Lally said that they were going to give me a
9    paper about the violation and I asked when I could expect the paper. Dr. Lally said that I
10   could expect the paper anytime before the end of the day. I asked what they were going to do
11   with me and whether they were going to write me up or suspend me. Dr. Lally responded
12   "no, that's grounds for termination." I said ok. This conversation lasted about 5 minutes. No
13   one else was nearby during this conversation.

14          At about 3:20 p.m. on the same day, I was on my break and I passed by ER Manager
15   Cheryl when she said that she wanted to talk to me. I said that I would finish my break and
16   talk to her after I clocked back in. At 3:30 p.m., I went to Cheryl's office after I clocked back in.
17   Only Cheryl and I were present. I asked if this had to do with the union. Cheryl said
18   "technically, yes." I said that I was invoking my Weingarten right that I want a representative
19   to be with me on this. Cheryl asked "what's that?" I had a card describing my Weingarten
20   rights with me and gave it to Cheryl to look at. She read it. Cheryl at that time told me to read
21   a paper she had on her desk. Cheryl said it was their solicitation policy. I did not look at the
22   paper so I do not know what it was. I told Cheryl that I would read the policy on my own
23   time. I have attached a copy of my Weingarten card as Attachment 3 to this affidavit. Cheryl
24   asked when we wanted to meet. I asked to meet the next day at about 8 a.m. Cheryl said she
25   was available. I asked if I could leave to call my rep. She said it was ok. I left and called my
26   rep. After about 10 minutes, I came back to Cheryl and said that we could meet the next day at
27   8 a.m. She said that she did not know how to do this and that it was her first time. I said it

I have carefully and completely read and understand the contents of this page: ⓦ

Exhibit 3
Page 89 of 402

1    was my first time too. I asked if I could get proof of my violation and I asked who complained

2    and when. Cheryl said that they were not going to write me up. She said that this was not a

3    counseling and that they were not giving me a write up. I said that I just wanted to confirm

4    that this was not a written warning, a verbal counseling or an investigation. She said it's not. I

5    asked if she still needed to talk to my rep if that was the case. Cheryl said if I wanted her to. I

6    said that if this was not a warning or investigation then she didn't need to. We cancelled the

7    meeting. I asked for my Weingarten card back. This meeting lasted about 30 minutes

8    including the time I left to call my rep. We did not meet the next day.

9         During my employment at Chino Valley I have not received an employee handbook or

10    a copy of the Employer's solicitation policy. Before my conversation with Dr. Lally and

11    meeting with Cheryl, I was not aware of any policy the Employer had on solicitation.

12         A couple of days after the election, I was in the nursing station in the ER and Dr. Lally

13    and some ER doctors were talking about whether a monitor tech (this is a clerk position) could

14    get a job as a nurse in Chino when she graduates from nursing school. Dr. Lally said that

15    they'd have to go through "Ronald's folks here because everything has to go through them"

16    and I said "yeah, that's right Dr." One of the doctors (I don't recall which one) said that he'd

17    heard I was the leader of the union and I said "no I'm not because we have not had an election

18    yet to determine who would be the leader." The doctor said "Really, you don't have a leader

19    yet." He said that some of the nurses upstairs think that they are. Dr. Lally asked how we

20    determine the leader and I said through an election because we exercise democracy. Dr. Lally

21    said oh ok and left. This conversation lasted less than 10 minutes.

22    **Discipline**

23         On or about May 5, 2010, sometime around 10 a.m., Cheryl called me into her office.

24    Only Cheryl was present. Cheryl said that she was going to give me a verbal counseling for

25    being tardy. She then read off of my timecard and said that I had three episodes of tardiness.

26    None of the times that I was tardy were after 7:07 a.m. (One or two of the episodes was 7:01

I have carefully and completely read and understand the contents of this page: ⟨signature⟩

**Exhibit 3**
**Page 90 of 402**

1   a.m.) Cheryl showed me my timecard and made me sign the paper. Cheryl said that it was
2   not just me and that she had written up 29 other employees. I did not say anything. This
3   meeting lasted less than 5 minutes. The door to Cheryl's office was open during this meeting.
4   I did not get a copy of the document I signed at this meeting.

5        Before the election, the practice at the hospital was that if you clocked in after 7:07 a.m.,
6   or before 7:23 p.m. for the dayshift, the Employer would dock 15 minutes off your pay. I knew
7   about this policy from the time I began working at Chino. I can't recall whether any manager
8   or supervisor told me about this policy. Before my write-up I had been tardy to work. In 2008
9   or early 2009, the former ER manager told me not to be late anymore after I had clocked in
10   after 7:07 a.m. I do not know if this was a verbal warning. I did not receive anything in
11   writing. Every year I receive low scores on my evaluation for being tardy but I do not recall
12   receiving any kind of write up for being tardy before May 5, 2010.

13        At about 3:30-4 p.m. on May 5, 2010, Cheryl called me into her office again. When I sat
14   down I said that if this was with regard to the triage/charge nurse issue I had nothing to do
15   with it (the charge nurse and triage nurse were having a dispute that day) and that I had just
16   covered the triage nurse because she had asked me to. Cheryl said that it had nothing to do
17   with that. Cheryl said that she was giving me a final warning for unsatisfactory work
18   performance. I asked for what. Cheryl said that the department of health came in on Monday
19   and they did a random audit of April's log of patients. Cheryl said that they had pulled out
20   two charts and my name and Yesenia DeSantiago's (a co-worker) were on one of the charts.
21   She said that they were writing up Yesenia for the same thing. Cheryl showed me the
22   discharge paperwork for the patient and said that the patient had come in with high blood
23   pressure and that I had discharged a patient with high blood pressure. She said that she had
24   attached the paperwork including the dictation of the doctor (this refers to what the
25   emergency room personnel did to treat the patient) and it didn't say anything about the blood
26   pressure. She said that I violated the policy and procedure with respect to reassessment. She

I have carefully and completely read and understand the contents of this page: 

Exhibit 3
Page 91 of 402

1   then showed me a copy of the policy. I have attached my write up as Attachment 4 and the

2   policy as Attachment 5. She said that I had failed to repeat the vital signs as well. I said that

3   number six on Attachment 5 did not say anything about vital signs. I asked her why I was

4   getting a final warning. Cheryl said that the administration had asked her to give me that. I

5   said that I had not done anything wrong to the patient and that they could call in the patient to

6   ask if I had done anything wrong. Cheryl said that that was not necessary. She said that the

7   hospital was getting fined and that because of that I was getting a final warning. I asked her if

8   I could step out and review the chart. She said that I could pull out the chart and print it and

9   review it. I left the office and was gone for about 10 minutes while I printed the chart and

10  reviewed it and then went back to Cheryl's office. When I returned to Cheryl's office I brought

11  my co-worker Ahmed Kassim with me. I told Cheryl that the paperwork showed that the

12  doctor had been aware of the patient's blood pressure and he ok'd the patient to be discharged

13  with the blood pressure and I showed this to her on the paperwork. I said that the policy

14  states that the patient's chief complaint must be reassessed at discharge not the vital signs. I

15  told her that I reassessed the chief complaint of the patient as documented on my nursing

16  notes. I read my warning and asked Cheryl if she seriously believed that I had unsatisfactory

17  work performance. Cheryl said that management wrote the write-up and asked her to give it

18  to me. I then asked if I could call my rep. She said ok and that she would be in early the next

19  day. I left her office. I called my rep and returned to Cheryl's office after 10-20 minutes but

20  Cheryl was gone.

21       I was charge nurse on April 1, 2010, the day for which I was written up for

22  unsatisfactory work performance. I recall speaking to the patient on April 1, 2010 but I do not

23  recall who the primary nurse was for that patient.

24       I had never seen the "reassessment policy" which is attached as Attachment 5 before

25  receiving my write up. I was not able to find it online through the intranet and have never

26  seen a copy of it in our policy and procedure book which is kept in the ER department. It is

I have carefully and completely read and understand the contents of this page: 

Exhibit 3
Page 92 of 402

1   the practice in the ER that we do not re-check vital signs if a patient has only been in the ER
2   department for less than one hour and if the doctor is aware of the vital signs upon discharge.
3   In the case of the patient for whom I was disciplined for, the patient had been in the ER for 45
4   minutes.

5        The next day, May 6, 2010, before 7 a.m., I saw Cheryl and I told her that my rep could
6   come in at 8 a.m. Cheryl said that was fine. At 8 a.m. my rep came, Minerva Aller-dela Fuente
7   ("Minerva"), and I met her in the ER. I asked Cheryl if it was ok for me to talk to Minerva.
8   Cheryl said it was fine and that I could talk to Minerva in the quiet room (this is a room in the
9   ER.) While I was talking to Minerva, Cheryl came in and I introduced Minerva to Cheryl.
10  Cheryl left again and said that she was going to get Linda Ruggio, Director of Nursing. Cheryl
11  came back a couple of minutes later and said that Linda wanted to talk to me. I asked Minerva
12  to come with me. Cheryl, Minerva, and I went to Cheryl's office and Linda was there. When
13  we arrived I introduced Minerva to Linda and Linda said that she was sorry but I didn't have
14  the right to outside representation at this time because we did not have a contract yet and that
15  UNAC persons are not allowed on the Chino premises. Minerva responded "according to the
16  NLRB" and then Linda interrupted saying "are you threatening me" to Minerva. Linda again
17  said "are you threatening me?" Minerva said "no ma'am." Linda then said "Call security and
18  call Lex Reddy." Lex Reddy is the CEO of Prime Healthcare which owns Chino. I told
19  Minerva to leave. Linda handed me a paper and said read this and go to H.R. Linda told me
20  to call her or talk to Cheryl if I need help with the policy. I have attached the papers Linda
21  handed me as Attachment 6. They set out the Employer's "Dispute Resolution Policy." I then
22  walked with Minerva to the main hospital lobby and thanked Minerva and told that I was
23  sorry. Minerva then left. This meeting with Linda lasted under 10 minutes.

24       On my way back from walking Minerva out, Cheryl told me to go to HR and write a
25  dispute about my write up. I said that I did not want to use Chino's equipment to write up my
26  dispute and get in trouble for it. Cheryl said that I could use her computer or any of the

I have carefully and completely read and understand the contents of this page:  🕊

Exhibit 3
Page 93 of 402

1   computers to write it. I said that I preferred not to and she handed me a pad of paper to

2   handwrite my dispute. Cheryl told me that I could get statements from my co-workers with

3   regard to my care. Cheryl told me that I only had until 10:15 to finish my letter because the

4   director of HR was leaving. Cheryl said that we should go check with Arthi Dupper, the Head

5   of HR. Lina Teer (my co-worker), Cheryl, and I walked to HR and spoke to the Head of HR

6   Arthi Dupper ("Dupper"). Dupper said that if I had a dispute that could not be resolved in the

7   department I had to submit my dispute letter to HR within 5 days. I asked if I could get

8   statements from my co-workers regarding my care of patients and Dupper said that I could get

9   statements and attach them to my dispute letter. This conversation with Dupper lasted less

10   than 5 minutes. On our way back from HR to the ER, I said that if I gathered all of this

11   information I wouldn't be violating the solicitation procedure and Cheryl said "of course not."

12   I said that I would turn in the letter in 5 days. To the best of my recollection, while we were

13   walking back to the ER I asked Cheryl if when she was a nurse working on the floor she had

14   checked every patients' vitals no matter how long they had been in the ER and she said she

15   tried to and I asked if she had for every single one and Cheryl started to tell me about one of

16   the nurses who used to do it every single time.

17       On May 7, 2010 I went in to the office on my off-day to speak to Cheryl about how I had

18   been told to skip phase 1 and phase 2 of the Employer's dispute resolution process. I said that

19   she could fix the problem without me going to HR. She left her office and came back with a

20   document that she handed to me. This is attached as Attachment 7. She said that the they

21   were not going to fix it and that they wanted to see what I had. She did not explain what she

22   meant by "they". I left. I turned in a dispute letter on May 12, 2010. This letter is attached as

23   Attachment 8. I included statements from over 20 of my co-workers about the standard of my

24   care with my dispute letter. I have only provided copies of these statements from my co-

25   workers about my standard of care to my Employer. I have not provided the Board Agent

26   with copies of any of the attachments to my dispute letter to this affidavit.

I have carefully and completely read and understand the contents of this page: _____

Exhibit 3
Page 94 of 402

1   On May 14, 2010, at about 4 p.m., Linda called me into her office. Linda was present as
2   well as Jean Arriaga who is the IT head. When I arrived Linda said that she knew I had rights
3   and that she only had one question. I said that was OK. Linda said that "we did a random
4   audit" and that my name came out and that I had printed a patient's chart on April 5 (this was
5   the patient for whose care I had received my May 5 write-up). Linda asked me why I had
6   printed the chart on April 5, a month before my discipline. I said that I was not even sure if I
7   was working on April 5. I asked if she minded if I checked my cell phone to see if I had been
8   working. I checked my phone and saw that I had been working. I said that I had been
9   working but never had the patient on April 5. (Patient had been in the ER on April 1 and April
10  5. I was written up for my performance with respect to the patient's visit on April 1.) I said
11  that I had no idea that I was going to get written up for that patient and the only thing I could
12  think of was that I left my computer and was logged on and that somebody had printed the
13  patient chart that day. Linda said that it was a HIPAA violation and that she needed to report
14  this because it was a breach in the system. I asked her to see if the patient was in the ER on
15  April 5 and Jean looked at the log and said that the patient was in the ER that day. Linda said
16  that on May 5 I had printed the patient's records again and that was another HIPAA violation.
17  I told Linda that Cheryl told me that I could print the chart and review it. I said that made
18  sure I erased the name and only left the medical record and account number for reference.
19  Linda said that they needed to investigate this and would talk to Cheryl on Monday and that
20  they would let me know if they were going to report this. Linda said that she had only 5 days
21  to report this. Linda did not say who she was going to report this to. Linda asked when I
22  would be back at work and I said Wednesday. Linda said that she would let me know by
23  Wednesday. I was about to leave the office and Linda said "one more thing." She said when I
24  submitted my dispute letter I attached a copy of the doctor's dictation and my nursing notes
25  and she said that was another HIPAA violation. I said that I had erased the name for patient
26  confidentiality and I left the medical reference number for them to go review it. Jean said I
27  should not have done that and should have erased everything. I said that when they wrote me

I have carefully and completely read and understand the contents of this page: 

1 up they had attached the patient's record that had all of the information on it.  Linda said that

2 she would ask Cheryl about this too.  Linda asked me if I mailed or hand-delivered the letter

3 to HR and I said that I hand-delivered it to one of the HR personnel.  She said that this was

4 another HIPAA violation because it had a patient's record on it and the HR person had

5 nothing to do with the record.  I told Linda that the medical record was in the middle of the

6 stack of papers I turned in.  Jean said that a person could be held financially liable if found

7 guilty for a violation of HIPAA and not just the Employer now.  Jean said an amount of money

8 but I don't recall what it was.  I asked if they wanted the copy of the record that I had printed

9 out and Linda said yes.  I left the office and grabbed the only copy of the medical record I had.

10 I returned to Linda's office and gave her the only copy of the patient's chart that I had.  I told

11 her that I had printed out a copy on May 5 and had blacked out the patient's name but you

12 could still read the patient's name on the document so I photocopied the chart and threw out

13 the original copy of the chart in the HIPAA bin (the HIPAA bin is a locked box that has all of

14 the documents we need to have shredded).  My meeting with Linda and Jean lasted about 20

15 minutes.

16  About five minutes later, Linda called me on the ER phone and asked me where I had

17 thrown the original print out of the patient's chart and when.  I said that I had put it in the in

18 the HIPAA bin on May 5.  Linda said ok.  This conversation lasted less than a minute.

19  I have not heard back from Linda since this phone call.

20 **Past Discipline**

21  Prior to 2010, in 2007 or 2008 I received a write up because I was the nurse in charge of a

22 patient and the supervisor could not find a corpse that the coroner had already picked up.

23  On one occasion in January 2010, I was told that I had been written up because the

24 orientee under my oversight had forgotten orders (orders are tasks/duties that she was

25 supposed to do).  I was not charge nurse that day, I was preceptor for the ER.  The preceptor's

I have carefully and completely read and understand the contents of this page: 

**Exhibit 3**
**Page 96 of 402**

1    role is to train nurses who are new to the ER or new to Chino. I am the only preceptor in the
2    ER for the dayshift.

3    **Emails and Letters**

4    After the election, on April 12, 2010, I received a message through "MOX," the
5    hospital's email system, about the Employer's attendance/tardiness policy. This message is
6    attached as Attachment 9. I also received a message from AnneMarie Robertson on April 13,
7    2010 about making changes to the schedules. I have attached this as Attachment 10.
8    AnneMarie Robertson was the Director of Nursing and is now a Case Manager. On May 11,
9    2010, I received an email from Linda Ruggio about tardiness. This email is attached as
10   Attachment 11. Management sends most memos to employees through MOX.

11   **Flyers**

12   I have attached as Attachments 12 and 13 copies of anti-union flyers posted at Chino on
13   bulletin boards, in the radio room, in the break room, and in our mailboxes. I do not know
14   who posted or distributed them. I saw these flyers starting in March 2010, a few days after we
15   filed the petition for an election with the NLRB.

16   **Meetings**

17   About one to two weeks before the election, I attended a mandatory meeting which
18   took place in the second floor conference room at Chino. Linda Ruggio and Suzanne Richards
19   (the VP of Operations) were present for the Employer. About 8 nurses were present. Both
20   Linda and Suzanne spoke at this meeting. We were shown a video clip about unions. Mostly
21   Suzanne spoke and said that we are going to end up paying dues and that we would lose the
22   family atmosphere and that we would lose our flexibility with scheduling. She showed us a
23   slide version of what I have attached as Attachment 12. This meeting lasted about an hour and
24   a half. I do not recall any other details of what was discussed at this meeting at this time.

25   **May 3, 2010 Meeting**

I have carefully and completely read and understand the contents of this page: 

1        A couple of days before May 3, 2010, I received a MOX message telling me that there

2    was a mandatory meeting for registered nurses. On or about 8 p.m. on May 3, 2010, I attended

3    a meeting which took place in a conference room on the first floor at the Chino facility. There

4    were about 15-20 nurses present. Present for management were Lex Reddy and Arthi Dupper.

5    When I arrived Reddy was speaking and said that the policies and procedures have to be

6    observed and that they are addressing the nursing shortage and hired 40 new nurses. Reddy

7    said that if we have issues not to go through the newspaper or any third party but we should

8    go directly to them. He did not explain what he meant by "them." Reddy said that the

9    policies are going to be enforced and employees who violate the policies would be dealt with

10   accordingly. He repeated this statement about three times during this meeting. Reddy also

11   showed a picture of Cheryl's car (her car had been keyed—a straight line had been scratched

12   into it) and said that it was wrong for nurses to do that but that he wasn't saying we did it.

13   Dupper did not speak at this meeting. Reddy had a paper in his hands during this meeting

14   and looked at the paper while he was talking. I do not know if he was reading directly off of

15   the paper. I do not recall what else Reddy said at this meeting. This meeting lasted 20

16   minutes.

17        **Charge Nurse Duties**

18        We only have one charge nurse in the ER on the dayshift. Her name is Samantha Jones.

19   Anne Johnson, Susie Eliey, Ahmed Kassim, and I will fill in as charge nurse when Jones is out.

20   Usually the Employer will assign Johnson or Eliey as charge nurse before I would be asked to

21   fill in as charge nurse.

22        I began acting as a rotating charge nurse in late 2009. From January 2010 up until the

23   union election on April 1 and 2, 2010, I acted as charge nurse fewer than 10 times. I was charge

24   nurse on April 1, April 7, April 14, April 15, April 20, April 24, and May 12, 2010. I am

25   currently scheduled to be charge nurse on May 19, May 20, May 27, June 3, June 11, June 15,

26   and June 24, 2010.

I have carefully and completely read and understand the contents of this page: 

**Exhibit 3**
**Page 98 of 402**

1    As charge nurse, I give nurses room assignments telling nurses which rooms to take
2    care of. I also direct the flow of the emergency department. Our ER is divided into areas. The
3    front rooms are more critical while the back rooms are for less severe patients. I tend to rotate
4    people around when making room assignments. I also consider if someone is an LVN or an
5    RN. If all of the staff are RNS then I consider the RN works best and will place him/her there.

6    After the election, on or about May 3, 2010, sometime after 7:00 p.m. but before my shift
7    ended at 7:30 p.m. I was sitting at the nursing station when a few charge nurses were talking
8    about a meeting they had attended for the charge nurses. I don't recall which charge nurses
9    were there but I recall one of them saying that charge nurses were now expected to write up
10   employees for being tardy and for being insubordinate. I do not recall the charge nurses
11   describing in detail how they were supposed to write up employees. No supervisor or
12   manager has told me that I have the authority to discipline employees. I have never
13   disciplined an employee.

14   In or around December 2009 or January 2010, I was working with an orientee in the ER
15   who I did not think was a good fit in the ER. I talked to the then-ER Manager, Carlos
16   Gonzalez, about the orientee. Gonzalez asked me how the orientee was doing and I told him
17   that she still needed a lot of work. Gonzalez said something like we could not give her
18   forever. Gonzalez said that he was thinking about letting her go. I asked Gonzalez to transfer
19   the employee instead of letting her go. Within 2-3 working days, Gonzalez transferred the
20   employee to the med-surg floor of the hospital. I do not know if Gonzalez did any
21   investigation on his own before transferring the employee. I had spoken to Gonzalez several
22   times about this employee before I asked that she be transferred. I was working with this
23   orientee in my capacity as preceptor, not as a charge nurse. Other nurses had also told me that
24   the orientee was not fit for the ER and Gonzalez told me that other nurses had also told him
25   that the orientee was not fit for the ER.

I have carefully and completely read and understand the contents of this page: ⑥

**Exhibit 3
Page 99 of 402**

1       If an employee needs to leave work early after 6 p.m. I will let the employee leave so

2 long as there is coverage and then tell the ER Manager or the House Manager if the ER

3 Manager is not present. If it is before 6 p.m., the employee would go to the ER manager to ask

4 to leave early. I am not involved in hiring, layoff, recall, promoting employees, rewarding

5 employees, or firing employees. As for evaluating employees, I have not evaluated the

6 performance of any Chino employees with the exception of the orientees I work with as

7 preceptor. As charge nurse I have evaluated the performance of registry nurses. Registry

8 nurses are not affiliated with Chino but fill in for the day. To evaluate their performance I fill

9 out a checklist and write comments about how the person worked that day.

10       In my capacity as preceptor, not as charge nurse, since 2007 or 2008, I have worked with

11 about 10 orientees who are employees new to Chino. I train the orientees by showing them

12 what we do in the ER. I have to fill out "competency forms" for the orientees. The

13 competency forms are checklists that must be completed and turned into the ER manager

14 before a nurse can work in the ER. I do not write out any comments about the orientees. The

15 ER Manager will ask me my opinion about how the orientees are doing and I give my opinion.

16       I answer patient or family members' complaints. If we receive test results as charge

17 nurse we are required to follow up with the patient. I get paid an additional $2/hour when I

18 act as charge nurse.

19       I have not been written up or held responsible for the work of the nurses I oversee

20 when I am charge nurse. No one from management has told me that I will be held responsible

21 if one of the nurses I oversee as charge nurse does not properly do his/her job.

22       **Chill**

23       After the election, employees, including me received a memo from Dr. Lally saying that

24 the Employer was filing objections with regard to the election and that they would take action

25 against previous and present employees involved. I do not have a copy of this memo at this

26 time. Since receiving that memo at least 20 of my coworkers have told me that they are afraid

I have carefully and completely read and understand the contents of this page: _____

Exhibit 3
Page 100 of 402

1   of losing their jobs.  My coworkers and I have talked about how the Employer has hired 40

2   new nurses and we think that they are hiring our replacements because we are already

3   overstaffed in the ER and employees in telemetry, med-surg, and ICU are being having shifts

4   cancelled because of low patient numbers.  I am afraid to go to work now because I have been

5   audited twice in the last month and have never been audited before.  I am also afraid because

6   now that I have a final warning, anything I get in trouble for could cause me to be terminated.

7
8   **I am being provided a copy of this Confidential Witness Affidavit for my review.  If, after reviewing this**
9   **affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately**
10  **notify the Board Agent.  I understand that this affidavit is a confidential law enforcement record and**
11  **should not be shown to any person other than my attorney or other person representing me in this**
12  **proceeding.**
13
14  **I have read this statement consisting of  15  pages, including this page, I fully understand its contents,**
15  **and I certify that it is true and correct to the best of my knowledge and belief.**

16
17
18                                      _____
                                        Ronald Magsino (Signature of Witness)

19  Subscribed and Sworn Before Me at
20  Los Angeles, May 17, 2010
21
22  _____
23  Joanna Silverman, Board Agent
24  National Labor Relations Board

I have carefully and completely read and understand the contents of this page: _____

Page 15 of 15

**Exhibit 3**
**Page 101 of 402**

# ONLY ONE OPTION ON APRIL 1ST & 2ND

 Vote **YES** to legally secure our wages, benefits, and working conditions in a written contract

☒ Hope that Prime Healthcare will treat us fairly

☒ Quit

Attachment 1

Exhibit 3
Page 102 of 402

    

   

   

WE'VE ALR

   

   

    

**Exhibit 3**
**Page 103 of 402**

    

   

   



   

   

    

**Exhibit 3**
**Page 104 of 402**



**Exhibit 3**
**Page 105 of 402**

# ONLY ONE OPTION ON APRIL 1ST & 2ND

 Vote **YES** to legally secure our wages, benefits, and working conditions in a written contract

☒ Hope that Prime Healthcare will treat us fairly

☒ Quit

Attachment 2

**Exhibit 3**
**Page 106 of 402**




















WE'VE ALR
















**Exhibit 3**
**Page 107 of 402**

     

    

    



    

    

     

**Exhibit 3**
**Page 108 of 402**



**Exhibit 3**
**Page 109 of 402**

## WEINGARTEN CARD

*(If called to a meeting with management, read the following or present this card to management when the meeting begins.)*

"If this discussion could in any way lead to my being disciplined or terminated, or affect my personal working conditions, I respectfully request that my union representative, officer, or steward be present at this meeting. Until my representative arrives, I choose not to participate in this discussion."

Attachment 3

### KNOW YOUR RIGHTS – INVESTIGATIONS

Anytime you are questioned by a supervisor where you believe discipline may result or notes are kept by the supervisor:

1. Request a UNAC/UHCP Representative. Management must ensure a Representative is supplied upon request.
2. BEFORE YOU ANSWER ANY QUESTIONS, YOU HAVE THE RIGHT:
   a. to know who is your accuser.
   b. what specific rule you're accused of violating.
   c. review documentation management may have against you.
   d. time to confer with your Representative.
3. Don't answer anything if a Representative is not provided, just keep the chair warm.

**UNAC/UHCP (800) 762-5874**

**Exhibit 3**
**Page 110 of 402**



# CHINO VALLEY
# MEDICAL CENTER

## INDIVIDUAL PERFORMANCE IMPROVEMENT PLAN

Date:   5-4-10

| Name: | Magsino, Ronald | Position: | Registered Nurse | Dept.: | Emergency |
|---|---|---|---|---|---|

| Type of Action | Verbal Warning _____     Notice of Disciplinary Suspension _____ days from _____ to _____ <br><br> _____ Written Warning     _____ Notice of Investigatory Suspension. <br> __X_ Final Written Warning <br> _____ Termination. Effective Date: _____ <br> _____ Final Paycheck attached in the amount of $_____. |
|---|---|
| Reason for Action | Explain nature of performance deficiency and/or unacceptable behavior and how it affects the Department. **Unsatisfactory work performance. Per California Department of Public Health surveyors, Upon review during a complaint survey it was found that the documentation failed to meet the Standard of Care regarding appropriate re-assessment of a patient and failure to Comply with Chino Valley Medical Center's Policy regarding re-assessment.** |
| Facts and Events | State the facts leading to this action <br> **See attached. On 4-1-10, Ronald was the primary nurse for patient MR#▮▮▮. Ronald Failed to obtain and document updated vital signs to patients Discharge Summary.** |
| Previous Action | Has the employee been counseled or received counseling action for the same or similar reason? <br> ___Yes     ___No     Date action was taken: _____ <br> If yes, what type: |
| Performance Improvement Plan | If appropriate, state the employee's action plan for performance improvement. <br> **Re-assessment of patient condition according to CVMC Policies and Procedures. Vital Signs will be obtained and documented on every Discharge Summary on every patient.** |
| Improvement Period | Indicate the maximum amount of time allowed for improvement. <br> **Immediately** |
| Further Action To Be Taken | State what action may follow if improvement is not achieved. <br> **Continued failure to comply with any hospital policy will result in immediate termination With cause.** |

| Employee's Signature                     Date | Supervisor's Signature                     Date |
|---|---|
| Refuse to sign. <br> Dispute to Kaiser 5/7/10 | ~~signature~~ RN        5/5/10 |

Your signature is not an acknowledgement of fault, but a receipt of notice only.

Ü^åæ&¢^å/ª^ Á
ÞŠÜÓÁ

400-0408

| CHINO VALLE MEDICAL CENTER | | Page(s): | 1 of 1 |
|---|---|---|---|
| | | Saved As: | Pt Assessme nt in ED |
| **DEPARTMENTAL POLICIES AND PROCEDURES** | | | |
| **Subject:** | PATIENT ASSESSMENT /REASSESSMENT IN THE EMERGENCY DEPARTMENT | Formulated: | 12/95 |
| **Manual:** | EMERGENCY DEPARTMENT | Reviewed: | 11/06 |
| **Governing Board Approval** | Date: | Revised: | 2/07 |

### Policy:

The Hospital nursing staff shall provide quality-nursing care to patients presenting for emergency treatment. Nursing care is provided by nurses knowledgeable and trained in emergency care. Licensed Vocational Nurses and Emergency Room Technicians work under the direct supervision of the RN to assist with the collection of data and meeting the needs of the patients.

### Procedure:

1. The initial assessment shall be completed by a Registered Nurse within 15 minutes of admission to the department.

2. Assessments and vital signs shall be completed following the ED assessment standards.

3. Using triage guidelines and Patient Care Standardized Procedures, nursing care shall be planned and implemented based on information gathered from the assessment(s).

4. All patients shall be seen by an Emergency Department provider.

   4.1 Provider orders shall be carried out.

   4.2 Providers shall be assisted with procedures.

5. Patient/families/significant other(s) shall be educated throughout the visit regarding particular illness/injury, medications, care following discharge and prevention of further injury/illness.

6. Reassessment of interventions/patient condition shall be done on an ongoing basis. For Emergent patients shall have their chief complaint reassess a minimum of every hour. Urgent patients shall have their chief complaint reassess a minimum of every 2 hours and For Non-Urgent patients their chief compliant shall be assess prior to being discharge home.
   Pain is to be reassess in accordance's with hospital P&P

7. Information gathered, procedures/interventions performed and evaluation of effectiveness of the care rendered shall be documented.

Attachment 5

**Exhibit 3**
**Page 112 of 402**

| ![CHINO VALLEY MEDICAL CENTER] **CHINO VALLEY MEDICAL CENTER** | **Page(s):** | 1 of 2 |
|---|---|---|
| | **Saved As:** | **Policy 100.123** |
| **DEPARTMENTAL POLICIES AND PROCEDURES** | | |
| **Manual:** **HUMAN RESOURCES** | **Formulated:** | **12/06** |
| **Subject:** **DISPUTE RESOLUTION POLICY** | **Reviewed:** | **1/07, 6/07, 7/08, 2/09, 11/09** |
| **Governing Board Approval** **Date:** **March 2010** | **Revised:** | |

**SCOPE:**

Medical Center wide.

**PURPOSE:**

Medical Center encourages employees to communicate any concern(s) arising from work situations in an open manner, without fear of any reprisals. Reported concerns will be given careful consideration.

**POLICY:**



If an employee has cause to feel that he/she has not been fairly treated in accordance with relevant policies or has significant job-related concerns which are not being resolved, a means of redress is available in the form of a dispute resolution procedure.

**<u>INTENTION</u>**

Any employee who feels he or she has a valid concern shall utilize established procedures as indicated below. In order to handle any concern in an equitable and timely manner, employees are strongly encouraged to submit their concern(s) within five (5) working days of the incident to avoid miscommunication and potential difficulties.

It is important for employees to understand that nothing in this dispute resolution procedure is intended to create an express or implied agreement that alters the employment at-will relationship that exists between the Medical Center and its employees, as set forth in the Handbook and this Policy Manual.

**THE STEPS OF THE DISPUTE RESOLUTION PROCEDURE ARE AS FOLLOWS:**

**Step 1.** Within five working days of the incident or problem giving rise to the conflict, discuss the problem with the immediate supervisor. In most instances, a discussion with the supervisor can solve a problem to the employee's satisfaction. The conflict resolution will be treated in a business-like manner. The supervisor will investigate the concerns and provide the employee with an answer within five working days of the discussion.



**Exhibit 3**
**Page 113 of 402**

| **CHINO VALLEY** **MEDICAL CENTER** DEPARTMENTAL POLICIES AND PROCEDURES | | | | **Page(s):** | **2 of 2** |
|---|---|---|---|---|---|
| | | | | **Saved As:** | **Policy 100.123** |
| **Manual:** | **HUMAN RESOURCES** | | | **Formulated:** | **12/06** |
| **Subject:** | **DISPUTE RESOLUTION POLICY** | | | **Reviewed:** | **1/07, 6/07, 7/08, 2/09, 11/09** |
| **Governing Board Approval** | | **Date:** | **March 2010** | **Revised:** | |

**Step 2.** If the problem is not resolved at Step 1, an employee may arrange an appointment to meet with the department manager in order to reach a satisfactory solution. A request for such a meeting should be made within five working days after the employee receives a response from Step 1. The department manager should provide the employee with a written answer within five working days following the meeting.

**Step 3.** If, for any reason, an employee is dissatisfied with the decision of the department manager, the employee is to file a written report, along with supporting documentation (including witness statements, if any) and the remedy requested, with the Human Resources Director within five working days of receiving the response from Step 2.



The HR Director will investigate the matter by reviewing the documentation presented, interviewing both the manager involved and the employee who filed the grievance, and interviewing any employees, managers, or others who are party to the matter. A written decision will be rendered within 5 working days of the completion of the investigation.

**Step 4.** If an employee is still dissatisfied after receiving the decision of Step 3, the employee may file a written grievance, along with the remedy requested, with the Administrative Officer within five working days of the completion of Step 3. The grievance will receive attention from the Administrator, who will provide the employee with a written response within five working days of receiving the employee's response and requested remedy unless additional time is required under the circumstances. The Administrator's decision will be final and binding on all parties.

Employees are encouraged to utilize this procedure without fear of retaliation. No employee will be discriminated or retaliated against because the employee has elected to use this procedure. Anyone, regardless of position or title, whom the Medical Center determines has engaged in conduct that violates this policy against retaliation will be subject to discipline, up to and including termination.

This policy does not apply to claims involving perceived violations of the Medical Center's equal employment opportunity policies. Such claims should be reported immediately and in the manner set forth in the Company's "Equal Employment Opportunity" and/or "Harassment" policies, and will be addressed in accordance with the provisions of the applicable policy.



[Note: We made this policy to track the Conflict Resolution Policy found in the Employee Handbook as the policies were very similar but had some slight variations in their "steps" of resolution.]

**Exhibit 3** **Page 114 of 402**

Ronald,                                                      May 7, 2010

As per our conversation in regards to your dispute about the counseling you received

regarding the DPH complaint, I will need to refer you to Step 3 in the Dispute

Resolution Policy. Please file a written report to the HR Director with your supporting

Data.

Cheryl Gilliatt RN
Director Emergency Services
Chino Valley medical Center

Attachment 7

Exhibit 3
Page 115 of 402

May 12, 2010

To Whom It May Concern:

     Pursuant to Chino Valley Medical Center's internal grievance procedure, this letter concerns the counseling I received on May 5, 2010 from our Emergency Department Manager Cheryl Gilliatt RN. According to Ms. Gilliatt, Chief Nursing Officer Linda Ruggio directed her to issue the final written warning for unsatisfactory work performance because my documentation allegedly failed to meet the standards of care regarding appropriate reassessment of a patient and failure to comply with Chino Valley Medical Center's Policy regarding reassessment. Specifically, I was counseled to take the blood pressure of the patient before discharge, where a patient's initial vital sign is as high as the at-issue patient's blood pressure level. In issuing this discipline, Chino Valley Medical Center has not acted in accordance with relevant policies and procedures, and an attempt to resolve the problem within our department was never made.

     The policy that Ms. Gilliatt gave me regarding reassessment in the ER states that reassessment of a patient's condition shall be done on an ongoing basis during the Hospital visit, and that the chief complaint shall be reassessed upon discharge. The at-issue patient's chief complaint of flank pain was clearly assessed and reassessed at discharge, specifically I documented in my last note on the chart that the patient denies any pain and is in no acute distress. Furthermore, according to the Emergency Department treating physician's dictation – supported by my individual assessment of the patient and my clinical judgment as a Registered Nurse – the patient was stable for discharge.

     The at-issue patient was in the ER for less than one hour, displaying no signs and symptoms of multi-organ dysfunction, and the treating physician was aware of the initial blood pressure when discharging the patient. I have reviewed all policies and procedures of Chino Valley Medical Center, and did not locate any standards of care in the ER supporting the discipline. After surveying ER staff regarding the vital signs practice, everyone agreed that repeat vital signs is not necessary if the patient is in the ER for less than one hour and the treating physician is aware of the initial vital signs at the time of discharge. I have researched Nurses and Physicians' articles about symptomatic hypertension, Standards of Care in Emergency Departments, as well as frequencies of vital signs in Emergency Departments, and did not find any support for the newly-articulated expectation that repeat vital signs should have been taken under these circumstances.

     If Chino Valley Medical Center would like RNs to take repeat vital signs when a patient is in the ER for less than one hour and the treating physician has ordered discharge knowing the initial vital signs, it must revise its policy regarding reassessment accordingly. The policy that was given to me by Ms. Gilliatt was not accessible in the ER, nor was it available on the Hospital's Intranet. Even if the policy were known and accessible, it did not state the repeat vital signs expectation under these circumstances.

     The care given to the at-issue patient was adequate and within the standards of practice in the ER. As per the recommendation of my supervisor Ms. Gilliatt, I have attached copies of statements from fellow co-workers attesting to the high-quality standard of care I provided, as well as a supporting statement from the treating physician

Attachment 8

Exhibit 3
Page 116 of 402

of the at-issue patient. Reviewing this letter with the attached statements demonstrates
that I was not notified of the repeat vital signs expectation that led to the final written
warning; the expectation has not been conveyed previously to Hospital staff; the policy
provided by Ms. Gilliatt does not state this expectation; the general body of medical
literature and my own training do not support that the expectation under these
circumstances is generally recognized in the medical community; and a full and fair
investigation was not conducted because a properly-conducted investigation would have
shown I did **not** violate any Hospital policies, generally-recognized standards of care,
physician orders, or supervisor directives. Without any proof that the after-the-fact-
articulated expectation was known or followed in the Hospital previously, I strongly
believe that I should have not received any discipline, particularly a final written
warning.  I respectfully request that the final written warning be removed from my file
immediately, and that I receive written notification of the Hospital's decision.

Providing the highest quality of patient care is my constant objective, and I will
continue to follow all known policies, standards of care, orders, and directives when
treating patients in the ER.

Respectfully yours,

Ronald A. Magsino RN BSN MICN CEN

Exhibit 3
Page 117 of 402

For: ███████████                    From: James M. Lally
     Mon Apr 12, 2010 9:19 am       Taken by: James M. Lally (909-941-9927)

Dear Staff, it is very important that staff comply with our written policies and procedures
especially those related to attendance and tardiness.  I am asking my directors to monitor
and address appropriately any shortcomings in these areas.  This is a survey year and that
is an area of focus.  The manuals are available for your review through HR and/or soon
on-line.  thank you for your anticipated cooperation.  respectfully   dr lally

---------------------------------------------------------------------------------

SENT TO: #HOSP

Attachment 9

Exhibit 3
Page 118 of 402

For: ████████████              From: AnneMarie Robertson
    Tue Apr 13, 2010 1:20 pm    Taken by: AnneMarie Robertson (464.8621)

This is a reminder to ALL staff....

Once a schedule is posted by the Nursing manager,there will be no changes or
exchanges.If an emergency arises,the Manager needs to be informed to remove the staff
member from the Master /unit schedule.If
it is off shift/the House supervisor will make the
immediate change and forward the the department manager..If
an employee has a request for time off,they are to utilize
the "Request for time off" form which is found on the intranet under Human
Resources/forms.The form needs to be completed by the employee and submitted to the
Manager for approval allowing sufficient time for review..The
employee is responsible to contact the Manager to confirm
that a change has or has not been granted.Please do not leave requests on voicemail.
                            Thank you

-------------------------------------------------------------------------------------

SENT TO: #ADMDIR, #NUR

Attachment 10

Exhibit 3
Page 119 of 402

For: ████████████                          From: Linda M Ruggio
    Tue May 11, 2010 2:05 pm              Taken by: Linda M Ruggio (464.8922)

Hello Everyone,
I would like to clarify the issue regarding what constitutes tardy;

Tardy is defined by being late for your designated shift; if you are to start your work shift at 0700 and you clock in at 0701, your are considered tardy.

Regarding the "12-minute (formerly the 7-minute) grace period;
This grace period is a JB Dev policy that is strictly for time-keeping purposes and has absolutely no bearing on the issue of Tardiness;  Following is the verbiage regarding the grace period from JB Dev;

" A grace period of 12-minutes is applied to the total time worked for the day.  The paid hours will be rounded to the nearest hour or half hour if the total worked minutes fall within the 12-minute grace period.  All minutes falling outside the 12-minute grace period will be rounded to the nearest tenth of an hour".

For the issue of tardiness, the grace period is non-consequential.  What ever the hour you have been instructed to begin your work shift is the time you are expected to be at your work station ready to begin that shift.  Even 1 minute late is considered Tardy.

Please feel free to obtain a copy of the attendance and tardy policy available on the Intranet.

Thank you,

Linda Ruggio, RN, MSN, PHN
Chief Nursing Officer

---------------------------------------------------------------------------------------

SENT TO: #CLINICALMGRS, #NUR

Attachment 11

Exhibit 3
Page 120 of 402

# PROTECT YOUR FLEXIBILITY!

## WHAT MIGHT HAPPEN IF A UNION CONTRACT LOCKS IN WORKING RULES THAT DON'T FIT INDIVIDUAL NEEDS?

### HAVE YOU EVER...



√ been allowed to come in late/leave early because of responsibilities at home?

√ been allowed to leave early to pick up a sick child at school?

√ had your schedule rearranged to make it to school or another job?

√ changed your schedule with a co-worker after it was posted?

√ changed your schedule to accommodate your childcare needs?

√ been granted a special request over the phone on short notice?

√ been granted available overtime to meet your needs as opposed to by strict seniority?

√ been given assignments because of your skills, not because of how long you've been there?

√ been able to extend your vacation due to an important personal situation?

√ had car trouble and been given time off to take care of repairs?

√ made an honest mistake and your director treated it as nothing more than a lesson learned (our practice of "Just Culture")?

√ worked overtime even though you were not the next in line for it?

√ had special time off for family illness?

√ been able to select and attend training classes at Flex Ed cost-free?

√ been selected for promotion because of merit and hard work?

√ taken advantage of the hospital's open door policy?

√ had the opportunity to float to other departments for the purpose of learning?

Contracts are complete and cannot be deviated from. Work schedules will be locked in! This means that your flexibility could be gone. In all likelihood, if the rules in the contract will prevail.

## CAN UNAC GUARANTEE THAT ANY OF THESE THINGS WILL BE IN A UNION CONTRACT?

## VOTE NO ON APRIL 1 & 2!

Attachment 12

Exhibit 3
Page 121 of 402



# CHINO VALLEY
# MEDICAL CENTER
# YOUR BENEFITS
## – WITHOUT A UNION

**Collective Bargaining:** *The process of negotiation between employers and a union on wages, benefits and other terms and conditions of employment.*

### Pay

- Competitive Wages
- On-call RN pay ($5.00/hr)
- RN Shift Differential, majority of shift
  (3p – 11p, $2.50/hr; 11p – 7a, $4.00/hr)
- RN weekend Shift Differential ($2.00/hr)
- Relief Charge Differential ($2.00/hr)
- MICN pay ($1.50/hr)
- Relief Preceptor Pay ($1.50/hr for licensed)
- RN Crisis Pay ($10.00/hr)
- Float differential ($2.00/hr for RNs only, if
  required)

### Employee Perks

- Free Thanksgiving and Christmas meals
- Christmas Party
- Hospital Week celebration
- Corporate challenge
- Biggest Loser weight loss program
- Gift cards for blood drive donors
- Dr. Lally's annual birthday lunch
- Holiday Family Program

### Voluntary Benefits

- Long Term Disability
- Short Term Disability
- Gap Insurance
- Cancer/Critical Illness Insurance
- Accident Insurance
- 401k Plan (hospital matches up to 4%)
- Group Term Life Insurance

### Benefits

- Health: up to 100% medical coverage depending
  on plan, minimal co-pay
  Minimal out-of-pocket for dental and vision
- Medical opt-out program ($35 per pay period in
  lieu of medical coverage)
- No limit on lifetime medical benefits
- Vacation, sick leave and holidays
- 7 Paid Holidays
- Bereavement Leave – up to 3 paid days off
- Employee Assistance Program (EAP) for
  employees & families
- 1x base annual salary company paid life insurance
  (FT only)
- Education Tuition Reimbursement ($1,500 for FT
  and $750 for PT, per calendar year), with prior
  approval
- Education and Seminar Reimbursement (up to
  $250 annually, if approved by admin)
- CEUs, $5 reimbursed through lunch ticket
- Flex Ed, paid while you are learning
- Paid BLS/ACLS certifications & required courses
  for employment (FT)
- Certification Recognition
  ($500 for FT, $300 for PT)

### Other

- Vacation time cash-outs with no limits
- Open door policy
- Allow charitable fundraising for employee
  purposes
- Flexible scheduling

## You and YOUR FAMILY get all of this without a union.

## Everything on this list is negotiable—what are you willing to risk?

## YOU DON'T NEED UNAC

## VOTE NO on April 1 and 2, 2010

Attachment 13

**Exhibit 3**
**Page 122 of 402**

| | | |
|---|---|---|
| 1 | County of Los Angeles ) | Case Nos. 31-CA-29713 et al. |
| 2 | ) SS | |
| 3 | State of California ) | |

4      **Confidential Witness Affidavit**

5      **I, Ronald Magsino, being first duly sworn upon my oath, hereby state as follows:**

6      **I have been given assurances by an agent of the National Labor Relations Board that this**
7      **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8      **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9      **Affidavit in connection with a formal proceeding.**

10     My address is ███████████████████████████████████████████.

11     My phone number is 818.687.9065.

12     Please see my May 17, 2010 affidavit for my background information. I worked for

13     Chino Valley Medical Center ("Chino" or "the Employer") located at 5451 Walnut Avenue,

14     Chino, CA 91710 as a full-time staff nurse until May 20, 2010 when I was discharged.

15     **Subpoena**

16     I reported to work on May 19, 2010 at my regular time. Sometime in the afternoon, our

17     monitor clerk in the emergency room told me that someone had called for me to go to the

18     administration office. I went to the administration office which is located right next to the HR

19     office. When I arrived, Mary Schottmiller, the Employer's in-house lawyer, was there and told

20     me that Ted wanted to talk to me. (I believe that Ted is the Employer's lawyer. On May 19,

21     2010, I did not know that Ted was the Employer's lawyer, but I know now because I have seen

22     him during the Board hearing which started on May 25, 2010.) I went into a conference located

23     in the administration offices and Ted was there standing in the room. Ted asked me if I was

24     Ronald. I said that I was. I shook his hand and Ted told me his name. (I do not recall if he

25     told me that he was the Employer's lawyer at that time.) Ted asked what my last name was

Page 1

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg 74942-43 (Dec. 13, 2006) The NLRB will further explain these uses upon request Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page: ⟋

**Exhibit 3**
**Page 123 of 402**

1   and I told him my last name. Ted then handed me a paper and said that my check was there.

2   I did not want to take it and I asked him what it was and he told me that it was a subpoena.

3   He said that the Employer wanted me to appear in court on May 25. I told him that I was

4   working that day and asked what I was to do and he told me to give it to my Employer. I

5   asked him what else and he told me to read it at home. Ted told me that there was some stuff

6   that he needed me to bring and to just read it. I said thank you and left. Only Ted and I were

7   present for this conversation which lasted about 10 minutes. This was the first time I had seen

8   Ted. After this meeting, I left and went back to work. I have attached a copy of the subpoena I

9   received on May 19, 2010 to this affidavit as Attachment 1.

10  **Discharge**

11      On May 19, 2010, sometime in the morning, I asked if I could talk to ER Director Cheryl

12  Gilliatt's ("Cheryl"). We were in the radio room. I asked her if the Employer had told her

13  about the HIPAA thing. Cheryl said that they told her about my case and Yesenia's case when

14  she had come in on Monday. Cheryl said that she had investigated the April 5 incident and

15  found out that I had done a discrepancy and that Linda Ruggio was aware of it already.

16  (Doing a discrepancy means that I had been updating the chart because I had something new

17  to add to the chart like lab results. When I do a discrepancy I print out the chart to have the

18  doctor look at it and make any necessary changes. That was why I printed out the patient's

19  chart on April 5.) This conversation lasted about 10-15 minutes (we talked about other things

20  during this conversation).

21      On May 20, 2010, I came in to work and was the relief charge nurse that day. At about 3

22  p.m., I tried to clock out for lunch and I could not get the time clock to clock me out. I asked

23  some other employees to see if they could clock out and they could. I went to Cheryl's office

24  and her door was closed. I tried calling her and she did not answer. I was in the clocking area

25  trying to clock out when I saw HR Director Arthi Dupher ("Arthi") come out of Cheryl's office.

I have carefully and completely read and understand the contents of this page: 

1   Cheryl asked me if there was a problem with time clock. I told her that I could not clock out.

2   She told me that she would go to HR to see what was going on. I returned to work.

3        About an hour later, at about 4 p.m., Cheryl came over to the nursing station where I

4   was working and told me that Director of Nursing Linda Ruggio and Arthi wanted to talk to

5   me in HR. I asked her "is this it?" Cheryl did not answer. I told Cheryl what work needed to

6   be done and Cheryl told me not to worry about it and to just go to H.R. I asked Cheryl if I

7   could bring someone and she told me that I could bring anyone I wanted. I asked if I could

8   bring Lina (Teer Lina is my co-worker) and Cheryl said yes. I asked Lina to come with me and

9   she said yes. Lina and I then went to HR. When I arrived at HR, Linda Ruggio, Arthi, and a

10  member of the HR staff (I do not know her name) were seated in Arthi's office. I asked if they

11  minded if I brought Lina in and no one said anything. Lina and I came into the office. One of

12  them told me to have a seat and Lina stood behind me. The door was closed to the office.

13  Linda told me that she wanted to talk to me about my HIPAA violation and that she had done

14  her investigation and she ended up calling the patient and letting her know that there was a

15  breach with her medical information and that she had called DHS and reported the breach.

16  Linda said that I had four counts of HIPAA violations. I said that about the April 5th claim of a

17  HIPAA violation, I had been doing a discrepancy. Linda said that April 5 was not included in

18  the four counts. She told me that the first count was when I got my final warning I opened the

19  patient's chart and viewed it, the second count was printing the chart, the third count was that

20  even though I erased the name I had put it into my backpack, and the fourth count was when I

21  made copies of the chart and included it in my dispute letter. Linda told me that the fact that I

22  included the medical record in my dispute letter and handed it to the HR employee who had

23  nothing to do with the case was a violation. (Linda told me that there were only four counts

24  even though it sounded like she had listed five counts.) I did not argue. I said ok. I asked

25  Linda if I should expect a call from DHS. Linda responded no because they are slow in

26  processing these. I told Linda that if for some reason DHS needed to talk to me I was

27  authorizing HR to release my information to them. Then Arthi started talking and told me

I have carefully and completely read and understand the contents of this page: _____

1    that they received a copy of my dispute letter and she had done her investigation and was not

2    overturning my discipline. She said that it would still remain as a final warning that would be

3    on my record. Arthi gave me a letter telling me that my warning was not overturned. I have

4    attached a copy of this letter as Attachment 2 to this affidavit. Arthi then said that with regard

5    to HIPAA they were writing me up for it and that with that write up "they regret to inform me

6    that I could no longer work in Chino Valley Medical Center." Arthi handed me my check and

7    said that it included all of my time off. Arthi asked me to sign three papers. I don't recall

8    what they were. Arthi told me that I did not need to sign them. I said that I knew that it was

9    not going to change their decision if I signed them or not and told them that I would just sign

10   the papers. After I signed the papers, I returned my badge to them and Arthi asked that I

11   return any property of Chino Valley Medical Center. I found scissors that had been issued by

12   Chino and they told me to keep them and I said that they had asked me for all of the Chino

13   property and they told me to keep them. Before I left I asked if they knew that I was charge

14   nurse in the ER that day. I said that I wanted to make sure that I was covered before I left.

15   Arthi told me not to worry and that Cheryl had already taken over. I asked if I could go back

16   and get my stuff and clean out my locker. Arthi said yes. I told them that it was a pleasure

17   working with them and left. I was in this meeting for about 15-20 minutes.

18          After this meeting, I went back to my locker and collected my things and then left the

19   hospital. I have not been back to Chino Valley Medical Center since this meeting.

20   **Messages**

21          On or about April 5, 2010, I received a MOX message from Dr. Lally about how the

22   Employer was going to seek to invalidate the election results. I have attached this message as

23   Attachment 3 to my affidavit.

24   **Cameras**

25          One weekend a couple of weeks after the election, Daryl Lee, head of security, was

26   walking around the ER with two other people. I was in the radio room and saw Lee and asked

I have carefully and completely read and understand the contents of this page: _____

1    him what they were doing and he told me that they were looking at installing cameras. I did

2    not see them install cameras. I am not sure if the Employer ended up installing new cameras.

3    **Conversation with Gonzalez**

4        About two or three weeks before the election, on ER Director Carlos Gonazlez' last day

5    at Chino, I was off but went into work with relief charge nurse Susie Eiley to say goodbye to

6    him. We went to Gonzalez' office in ICU and said goodbye to him. I asked Gonzalez why

7    they were taking him out of the ER. He said that the Employer had asked around and had

8    gotten a lot of complaints about him being ER manager and I said that if the administration

9    thinks that he was the reason why we started the union then they're wrong. He said he did

10   not know what their plan was. We talked with Gonzalez about other topics for about an hour

11   and a half on that day.

12
13   **I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this**
14   **affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately**
15   **notify the Board Agent. I understand that this affidavit is a confidential law enforcement record and**
16   **should not be shown to any person other than my attorney or other person representing me in this**
17   **proceeding.**
18
19   **I have read this statement consisting of  5  pages, including this page, I fully understand its contents,**
20   **and I certify that it is true and correct to the best of my knowledge and belief.**
21
22                                        _____
23                         Ronald Magsino (Signature of Witness)

24   Subscribed and Sworn Before Me at
25   Los Angeles, May 27, 2010
26
27   _____
28   Joanna Silverman, Board Agent
29   National Labor Relations Board

I have carefully and completely read and understand the contents of this page:_____

FORM NLRB-31
(12-07)

## SUBPOENA DUCES TECUM

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

Ronald Magsino

To _____

_____

As requested by   Theodore R. Scott, Attorney for Employer

whose address is   501 W. Broadway, Suite 500, San Diego, CA 92101

(Street)          (City)          (State)     (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE   **a Hearing Officer**

_____ of the National Labor Relations Board

at   11150 West Olympic Boulevard, Suite 700

in the City of   Los Angeles, California

on the   25th   day of   May   20 10   at   9: 00   (a.m.) (p.m.) or any adjourned

or rescheduled date to testify in   Veritas Health Services, Inc. dba Chino Valley Medical Center

Case 31-RC-8795.

(Case Name and Number)

And you are hereby required to bring with you and produce at said time and place the following books, records, correspondence, and documents:

SEE ATTACHMENT A

In accordance with the Board's Rules and Regulations, 29 C.F.R. Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings), objections to the subpoena must be made by a petition to revoke and must be filed as set forth therein. Petitions to revoke must be received within five days of your having received the subpoena. 29 C.F.R. Section 102.111(b) (3). Failure to follow these regulations may result in the loss of any ability to raise such objections in court.

**B - 578914**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at   Los Angeles, California

this 10th day of May   20 10

*Lester A. Heltzer*

**NOTICE TO WITNESS.** Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

Attachment 1

**Exhibit 3**
**Page 128 of 402**

## ATTACHMENT A

to

Subpoena Duces Tecum
Veritas Health Services, Inc. dba Chino Valley Medical Center
Case 31-RC-8795

### DEFINITIONS

The following definitions shall apply to the terms used in this Attachment A:

1.  "Union" shall refer to United Nurses Associations of California/Union of Health Care Professionals, NUHHCE, AFSCME, AFL-CIO.

2.  "Union representative" shall refer to all persons identified as being on the Union's Staff on the Union's website as of May 13, 2010 (see Attachment A-1), as well as Union counsel Lisa Demidovich.

3.  "Employer" shall refer to Veritas Health Services, Inc. dba Chino Valley Medical Center.

4.  "Charge Nurse" shall refer to any person employed by the Employer who worked as a Charge Nurse at any time between July 1, 2009 and April 9, 2010, including but not limited to all persons identified on Attachment A-2.

5.  "Relevant time period" shall refer to any time between July 1, 2009 and April 9, 2010.

6.  "Document" shall refer to all writings or other record of any nature whatsoever within the possession, custody or control of the person to whom this Subpoena is directed, including documents in the custody or control of such person's agents, attorneys or advisors, including, but not limited to, communications; correspondence; memoranda; notes; records; reports; books; summaries or records of telephone calls or conversations; summaries or records of text messages; summaries or records or e-mail communications; summaries or records of personal conversations or interviews; calendars, day planners or diaries; work papers; drafts; copies; minutes or records of meetings or conferences; consultants' reports; appraisals; brochures; pamphlets; circulars; flyers; trade letters; press releases; notes; marginal notations; bills; invoices; checks; payroll records; performance evaluations; photographs; lists; journals; advertising; computer tapes, disks, or other computer storage media; electronic or magnetic storage media; and photographic matter or sound reproductions, including video and audio tapes.

7.  "RN" shall refer to any person who was employed by the Employer as a Registered Nurse at any time during the relevant time period.

8.  "Regional Director's Report" shall refer to the Regional Director's Report on Objections, Order Directing Hearing, and Notice of Hearing in this matter dated May 3, 2010.

### DOCUMENTS TO BE PRODUCED

1.  Any and all documents relating to any communication during the relevant time period between you and any representative of the Union. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO

1

**Exhibit 3**
**Page 129 of 402**

BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

2.    Any and all documents relating to any communication during the relevant time period between you and any other person, including any and all Charge Nurses or RNs, relating in any way to the Union's organizing efforts involving personnel employed by the Employer. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

3.    Any and all documents relating to bills for the use of cell phones and/or other personal electronic devices used by you during the relevant time period. NOTE: IN LIEU OF PROVIDING THE REQUESTED DOCUMENTS TO THE EMPLOYER, THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

4.    Any and all and all documents relating to bills for the use of any form of electronic or other communication you used during the relevant time period. NOTE: IN LIEU OF PROVIDING THE REQUESTED DOCUMENTS TO THE EMPLOYER, THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

5.    Any and all documents relating to any phone calls, text messages, e-mail or other electronic messaging, or any other form of communication between you and any Union representative during the relevant time period. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

6.    Any and all documents relating to any phone calls, text messages, e-mail or other electronic messaging, or any other form of communication between you and any other person, including any and all Charge Nurses or RNs, relating in any way to the Union's organizing efforts involving personnel employed by the Employer. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

**Exhibit 3**
**Page 130 of 402**

7.      Any and all documents relating to communications during the relevant
time period between you and any Charge Nurse employed by the Employer relating in any way
to the Union's organizing efforts involving personnel employed by the Employer.

8.      Any and all documents relating to communications during the relevant
time period between any Charge Nurse employed by the Employer and any employee employed
by the Employer as a RN relating in any way to the Union's organizing efforts involving
personnel employed by the Employer.

9.      Any and all documents relating to organizing activity by the Union during
the relevant period and directed at organizing any personnel employed by the Employer. NOTE:
IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE
DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO
ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN
*IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS
THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE
EMPLOYER.

10.     All authorization and/or membership cards signed by any Charge Nurse
during the relevant time period, including any authorization and/or membership cards you signed
if you were employed by the Employer as a Charge Nurse during said period.

11.     All authorization and/or membership cards signed by any RN during the
relevant period. NOTE: THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS
TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION,
WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE
EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER

12.     All documents relating to the distribution and/or solicitation of Union
authorization and/or membership cards during the relevant time period. NOTE: IF YOU WERE
NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE
RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE
DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA*
INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE
RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE
EMPLOYER.

13.     Any and all documents relating to the petition signed by Charge Nurses
titled "We Are Charge RNs We Are Not Managers" attached to the Regional Director's Report
as part of Attachment C and attached hereto as Attachment A-3.

14.     Any and all documents relating to the "Workplace Chart 007 with Phone
Numbers" document attached to the Regional Director's Report as part of Attachment C, the first
page of which is attached hereto as Attachment A-4.  NOTE:  IF YOU WERE NEVER
EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT
TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO
BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION,
WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE
EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

**Exhibit 3**
**Page 131 of 402**

15. Any and all documents relating to lists showing the Union's assessment of support for the Union among any Charge Nurses employed by the Employer during the relevant time period. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

16. Any and all documents relating to lists showing the Union's assessment of support for the Union among any personnel employed by the Employer during the relevant time period. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

17. All documents relating to the "We've Already Won" poster attached to the Regional Director's Report as part of Attachment C, attached hereto as Attachment A-5. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

18. All documents relating to the text message beginning "Leaders, congrat's on" attached to the Regional Director's Report as part of Attachment C and attached hereto as Attachment A-6. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE RELEVANT TIME PERIOD, THEN THE EMPLOYER IS WILLING TO ALLOW THE DOCUMENTS TO BE PRODUCED TO THE HEARING OFFICER FOR AN *IN CAMERA* INSPECTION, WHEREUPON ONLY NON-PRIVILEGED DOCUMENTS THAT ARE RELEVANT TO THE EMPLOYER'S OBJECTIONS ARE PROVIDED TO THE EMPLOYER.

19. All documents provided to the Union by any Charge Nurse during the relevant period, including any documents provided to the Union by you if you were a Charge Nurse at any time during such period.

20. All documents received by any Charge Nurse from any Union representative or Union supporter during the relevant time period, including any such documents received by you if you were a Charge Nurse at any time during such period.

21. All documents relating to any of the Employer postings/memos and NLRB election notices attached to the Regional Director's Report as part of Attachment C.

22. Any and all documents relating in any way to your efforts in support of the Union's organizing efforts involving personnel employed by the Employer. NOTE: IF YOU WERE NEVER EMPLOYED BY THE EMPLOYER AS A CHARGE NURSE DURING THE

Exhibit 3
Page 132 of 402

ATTACHMENT A-1



UNITED NURSES ASSOCIATIONS OF CALIFORNIA
UNION OF HEALTH CARE PROFESSIONALS

UNAC/UHCP · NUHHCE · AFSCME · AFL-CIO

| HOME | HISTORY | ABOUT US<br>MISSION STATEMENT | JOIN US<br>THE BOARD | STAFF | RESOURCE CENTER | CONTACT US |

KAISER NURSES

SHARP NURSES

ST FRANCIS NURSES

TENET NURSES

BALBOA NURSES

BEAR VALLEY NURSES

PETTIS NURSES

OPTOMETRISTS

PHYSICIAN ASSISTANTS



## The Staff

### OFFICERS

**Kathy Sackman, RN, President**
Email: Kathy@unac-ca.org

**Ken Deitz, RN, Executive Vice President**
Email: Ken@unac-ca.org

**Barbara L. Blake, RN, Secretary**
Email: Barbara@unac-ca.org

**Delima M. MacDonald, RN, Treasurer**
Email: Delima@unac-ca.org

**Stephen Soto de Mayor, PA, Parliamentarian**

### REPRESENTATION STAFF

**Moises Alarcon**, RN, Staff Representative, services
Kaiser Sunset and Kaiser Mental Health
Email: Moises@unac-ca.org

**Minerva Aller-dela Fuente**, RN, Staff Representative,
services Tenet Fountain valley, Garden Grove, Tenet
Lakewood, and Pettis Memorial
Email: Minerva@unac-ca.org

**Mary Cavanaugh**, OD, Union Partnership Representative
Email: Mary@unac-ca.org

**Gerardo Bajamundi**, RN, Staff Representative, services
Kaiser Bellflower
Email: Gerardo@unac-ca.org

**Arthereane Brown**, RN, Staff Representative, services
Kaiser Baldwin Park
Email: Arthereane@unac-ca.org

**Suzanne Delaney**, RN, Staff Representative, services
Kaiser Orange County
Email: Suzanne@unac-ca.org

**Barbara Dent**, RN, Staff Representative, services Sharp
Healthcare
Email: BarbaraD@unac-ca.org

**Denise Duncan**, RN, Staff Representative, services
Kaiser Woodland Hills and Kaiser Bakersfield
Email: Denise@unac-ca.org

**Becky Geiger-Motlagh**, RN, Staff Representative,
services Sharp Healthcare and Bear Valley
Email: Becky@unac-ca.org

**LATEST NEWS**

**MEETINGS/CLASSES**

**WORKING FOR YOU**

**SIGN-UP FOR E-MAIL UPDATES AND
ALERTS FROM YOUR UNION**

Joy Harvey, RN, Staff Representative, services Tenet
Fountain valley, Garden Grove, and Tenet Lakewood
Email: Joy@unac-ca.org

Carol Jones, RN, Staff Representative, services Kaiser
Riverside
Email: Carol@unac-ca.org

Barbara Macon, RN, Staff Representative, services
Kaiser Fontana
Email: BarbaraM@unac-ca.org

Sandy Oleson, RN, Staff Representative, services Kaiser
San Diego and Balboa
Email: Sandy@unac-ca.org

Armin Reyes, Staff Representative, services St. Francis
Email: Armin@unac-ca.org

Larry Rick, PA-C, Staff Representative, services Kaiser
South Bay
Email: Larry@unac-ca.org

Darla Smith, RN, Staff Representative, services Kaiser
Fontana and Kaiser Ontario Vineyard
Email: Darla@unac-ca.org

Donna Smith, RN, Staff Representative, services Kaiser
San Diego
Email: Donna@unac-ca.org

Kimberly Smith, RN, Staff Representative, services
Kaiser Panorama City
Email: KimS@unac-ca.org

Mike Zackos, RN, Staff Representative, services Kaiser
West Los Angeles
Email: Mike@unac-ca.org

## ORGANIZING STAFF

Kyle Serrette, Director of Organizing
Email: Kyle@unac-ca.org

Solito "Sunny" Barana, Staff Organizer
Email: Sunny@unac-ca.org

Vanessa Caballero, Staff Organizer
Email: Vanessa@unac-ca.org

Thor Causing, Staff Organizer
Email: Thor@unac-ca.org

Tony Dorono, Staff Organizer
Email: Tony@unac-ca.org

Olivia Guevara, Staff Organizer
Email: Olivia@unac-ca.org

Kuusela Hilo, Staff Organizer
Email: Kuusela@unac-ca.org

## POLITICAL ACTION STAFF

Jimmy Gomez, Political Director
Email: Jimmy@unac-ca.org

Jeremy Lanni, Political Affairs Representative
Email: Jeremy@unac-ca.org

Exhibit 3
Page 134 of 402
3/13/2010

Eric Robles, Political Affairs Representative
Email: Enc@unac-ca.org

To submit a question/comment regarding legislation or
politics, please email Political@unac-ca.org

## PUBLIC AFFAIRS STAFF

Russell Miller, Communications Specialist
Email: Russell@unac-ca.org

Eve Rojas, Public Affairs Specialist
Email: Eve@unac-ca.org

## RESEARCH

Bill Rouse, Executive Assistant to the Officers
Email: Bill@unac-ca.org

## ADMINISTRATIVE STAFF

Sharon Stillwell, Office Manager
Email: Sharon@unac-ca.org

Carolyn Benson-Johnson, Administrative Assistant
Email: Carolyn@unac-ca.org

Karina Leon, Administrative Assistant
Email: Karina@unac-ca.org

Carol McDonough, Administrative Assistant
Email: Carol@unac-ca.org

Lupe Rodriguez, Administrative Assistant
Email: Lupe@unac-ca.org

Jannette Williams, Administrative Assistant
Email: Jannette@unac-ca.org

## FINANCE STAFF

Beverly Schnelle, Controller
Email: Beverly@unac-ca.org

Tracy Best, Staff Accountant
Email: Tracy@unac-ca.org

Bonnie Brownell, Staff Accountant
Email: Bonnie@unac-ca.org

Kim Bynum, Staff Accountant
Email: KimB@unac-ca.org

Richard Leon, Staff Accountant
Email: Richard@unac-ca.org

Donna Wade, Staff Accountant
Email: DonnaW@unac-ca.org

For questions regarding association dues or to submit a
name change, please email Finance@unac-ca.org

Exhibit 3
Page 136 of 402

## **ATTACHMENT A-2**

### **Charge Nurses**

Edna Borbon
Roma Carpenter
Dolly Casas
Liezle Castro
Mariana Catiesanu
Rhoda De Leon
John Del Valle
Lucia Eiley
Joan Encalade
Felipe Florendo
Maria Cynthia Gabot
Cheryl Gilliatt
Teresa Hower
Xiuying Huang
Ann Johnson
Samantha Jones
Christine Lansang
Ofelia Margolis
Karianne Salazar
Angelica Silva
Laurel Smith
Dulce Suzon
Leslie Terrazas
Bienvenido Trinidad
Maryann Yan

**Exhibit 3**
**Page 137 of 402**

**ATTACHMENT A-3**

# WE ARE CHARGE RNs

# WE ARE NOT MANAGERS

To: Prime Healthcare & Chino Valley Medical Center Administration
From: Chino Valley Medical Center Charge RNs
Regarding: Charge RN Ability to be Part of the RN Union Formation Process

We, the Charge Nurses of Chino Valley Medical Center, do not consider ourselves managers and we do not have management level responsibilities, such as the ability to hire or fire. We ask that administration recognize that we are not managers by allowing us to have a voice and a vote in the nurses' process to form a union.



Exhibit 3
Page 138 of 402

**ATTACHMENT A-4**

**Workplace Chart 007 with Phone Numbers**



Assessment: Assessment
List: Charge Nurse Full Time
Report: Person Workplace Chart 007
1/28/2010 6:16:12 PM

OC=Organizing Committee

n of Health Care Professionals: Union of Health Care Professions
New Union Work Systems www.nuws.com

**Exhibit 3**
**Page 139 of 402**



## ATTACHMENT A-6

Leaders, congrat's on reaching 82% support. I'm sorry we couldn't fit all 104 pictures on the flyer -- but I think it looks good and it keeps management guessing who is pro-union. (I'm sure they have a copy by now) Remember, I never said the hike up the mountain was going to be easy...but the view is amaz ing. Imagine winning big and then working hard to finally get a strong contract that ensures consistency. Best, ▬▬

1

Exhibit 3
Page 141 of 402

Veritas Health Services, Inc. dba Chino Valley Medical Center          Case No. 31-RC-8795

## PROOF OF SERVICE BY PERSONAL DELIVERY

I am employed in San Diego County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 501 W. Broadway, Suite 900, San Diego, California 92101. On May _____, 2010, I served

SUBPOENA DUES TECUM NO. B – 5789 _14_

by personally delivering a copy of the document listed above to the person at the address set forth below.

_5451 Walnut Ave._

_Chino, CA 91710_

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on May _____, 2010, at _____, California.

THEODORE R. SCOTT

**Exhibit 3**
**Page 142 of 402**



# CHINO VALLEY
# MEDICAL CENTER

May 20, 2010

Ronald Magsino

██████████████████

Dear Ronald,

Thank you for the written dispute you submitted on May 12, 2010.   I have conducted an investigation and the discipline will not be overturned.

Please be assured that there will be no retaliation as a result of your written dispute submitted on May 12, 2010.

Thank you,

Arti Dhuper
Human Resources Director

Attachment 2

Exhibit 3
Page 143 of 402

| For: ██████████ | From: James M. Lally |
|---|---|
| Mon Apr 5, 2010 6:30 am | Taken by: James M. Lally (909-941-9927) |

Dear Staff:

As many of you already know, the National Labor Relations Board (NLRB) held an election last week to decide whether the registered nurses at CVMC would be represented by the United Nurses Association of California (UNAC). The results of the election were announced on Friday evening and the vote was in favor of the union.

CVMC will seek to invalidate the election results because UNAC and its representatives engaged in harassment, intimidation, and other unlawful conduct in order to coerce nurses to vote in favor of the union. Indeed, votes in favor of the union were obtained through intimidation, harassment, the unlawful use of supervisors to influence votes, and even acts of vandalism. CVMC will not tolerate such unlawful conduct and will be filing objections with the NLRB to set aside the election results and will pursue all available legal remedies, including, if necessary, actions against former and current employees that engage in unlawful conduct, to insure that its employees are free of harassement and intimidation by unions and other outside influences. CVMC will leave no stone unturned in its efforts to hold those responsible for such unlawful conduct accountable for their actions.

While pursing its legal challenges to the tainted election results, CVMC will continue its ongoing efforts to improve the quality of patient care. As many of you know, Prime Healthcare has poured millions of dollars into CVMC during the past five years to make a state of the art community hospital with, among other things, a state of the art cardiac cath lab, a digital radiology system, and the latest diagnostic and patient monitoring systems. CVMC will not let the union's unlawful conduct and the legal challenges resulting from such conduct distract it from its goal of providing comprehensive, quality healthcare in a compassionate, convenient, and cost-effective manner. I urge each of you to focus on the same goal. respectfully dr lally

%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%

---------------------------------------------------------------------------------
SENT TO: #HOSP

Attachment 3

**Exhibit 3**
**Page 144 of 402**

| | | |
|---|---|---|
| 1 | County of San Bernardino | ) | Case Nos. 31-CA-29713 et al. |
| 2 | | ) SS | |
| 3 | State of California | ) | |

4 **Confidential Witness Affidavit**

5 **I, Ronald Magsino, being first duly sworn upon my oath, hereby state as follows:**

6 **I have been given assurances by an agent of the National Labor Relations Board that this**
7 **Confidential Witness Affidavit will be considered a confidential law enforcement record by the**
8 **Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness**
9 **Affidavit in connection with a formal proceeding.**

10 My address is ███████████████████████████████████.

11 My phone number is 818.687.9065.

12      Please see my May 17, 2010 affidavit for my background information. I worked for

13 Chino Valley Medical Center ("Chino" or "the Employer") located at 5451 Walnut Avenue,

14 Chino, CA 91710 as a full-time staff nurse until May 20, 2010 when I was discharged.

15 **Switching Shift Policies**

16      Prior to receiving the April 13, 2010 MOX message from AnneMarie Robertson which is

17 attached to my May 17, 2010 affidavit, my understanding of the policy on making changes to

18 our shifts after the schedule is posted was that we could switch shifts with our coworkers

19 provided that this did not generate overtime and it was within the same week and pay period.

20 Prior to April 13, 2010, I had switched my shifts with coworkers frequently because at some

21 points I had another job with a fixed schedule and had to move my Chino shifts around to

22 accommodate that job. I would submit a request form to switch the shift and if the switch was

23 within the same pay period and did not generate overtime my manager would let me make

Page 1

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine used for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the National Labor Relations Board to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

I have carefully and completely read and understand the contents of this page: 

**Exhibit 3**
**Page 145 of 402**

1  the switch.  I also switched shifts with my coworkers upon their requests that I switch shifts

2  with them.  To the best of my recollection, I switched a shift once or twice after April 13 and

3  before my discharge when a co-worker asked me to switch shifts.  I did not ask to switch shifts

4  after I received the April 13 MOX.

5  **Crisis Pay Policies**

6        Sometime before the election, it may have been about six months to a year before the

7  election, I received a MOX from Carlos Gonzalez, then ER Manager, that if we took an extra

8  shift we would automatically get crisis pay.  Crisis pay means that we get paid about $10/hour

9  on top of our regular wages.  Sometime after the election, I don't recall when, but around May

10  20, 2010, I received a MOX either from Cheryl Gilliatt or Linda Ruggio saying that crisis pay

11  has to be approved by the director of nursing.  I recall the MOX said something about how we

12  could not pre-schedule crisis pay.  (In the past when schedules came out we were asked if

13  wanted to take extra shifts and if I did take extra shifts, I would submit a crisis pay form and

14  would be paid.)  Prior to this MOX it was my understanding that crisis pay would always be

15  approved when we took an extra shift and we submitted a request to be paid for crisis pay.

16  Prior to this MOX, every time I worked extra I would submit a crisis pay form and I was paid

17  crisis pay.  During the last two or three weeks that I was employed at Chino I worked about 2-

18  3 extra shifts and I was not paid crisis pay.  On one of the days that I worked an extra shift

19  during the last 2-3 weeks I was employed at Chino, I tried to submit my crisis pay form to

20  Gilliatt and she told me that the crisis pay has to be approved by the Director of Nursing and

21  would not take my form requesting crisis pay.  I cannot recall an occasion before I received the

22  MOX about needing approval for crisis pay when I submitted my form requesting crisis pay

23  and my crisis pay request was denied.

24  **May 3, 2010 Meeting**

I have carefully and completely read and understand the contents of this page: _____

Page 2 of 5

Exhibit 3
Page 146 of 402

1      In my May 17, 2010 affidavit I described a May 3, 2010 meeting. Yesenia DeSantiago,

2  my co-worker, was present at that meeting as well. To the best of my recollection Vincent

3  Hilvano was not at this same meeting with me but he went to the meeting with Lex Reddy on

4  or about May 6, 2010. I recall this because that was the day union rep Minerva came to meet

5  with me, Cheryl Gilliatt, and Linda Ruggio. I did not attend the May 6, 2010 meeting.

6  **Impression of Surveillance**

7      Beginning in either December 2009 or January 2010, my co-worker Teer Lina and I

8  would meet with employees in the employee parking lot at Chino after our shift ended

9  starting at about 7:30 p.m. to talk to them about the union. Over the course of a few weeks to a

10  month, on most of the days that we were working, Lina and I would go to the employee

11  parking lot to talk with our co-workers about the Union. I recall one instance when I saw one

12  security guard in his golf cart facing in the direction where Lina and I were talking with our

13  co-workers. It is possible I saw him one other time but I cannot recall. When I saw the

14  security guard on the one occasion, he arrived after Lina and I had started talking to

15  coworkers and stayed for about a half an hour, facing in our direction. I did not notice if he

16  was writing anything or if he had a camera. Lina and I were in the parking lot close to our cars

17  and closer to the exit and the security guard was in his cart about 6-10 car lengths away from

18  us. It was dark on the occasion when I saw this security guard. I do not know his name. Lina

19  and I spoke to two coworkers during the time the guard was facing in our direction. I had

20  been in the parking lot on other occasions and had not seen security guards, but I know that

21  they make their rounds so I cannot say if it is unusual for the guard to be in the employee

22  parking lot. On the occasion that I saw the guard, I did not see him around at all, he just sat in

23  his cart for about 30 minutes facing in our direction.

24  **Chill**

I have carefully and completely read and understand the contents of this page: _(M)_

**Exhibit 3**
**Page 147 of 402**

1    After I was discharged, on about June 2, 2010, I received an email from my former co-
2   worker Jennifer Waggoner asking how I was doing and telling me that she quit because she
3   could not deal with all of the things that management was doing.  Waggoner wrote that she
4   was trying to lay low.  Waggoner had told me that they had converted her to per diem from
5   part-time without telling her and she was upset about this.  Waggoner told me that she had
6   wanted to work the weekends and Gilliatt told her that she could not do that unless she was
7   per diem.  My former co-worker Ishla _____ stopped returning my phone calls starting about
8   two weeks after the election.  Ishla had been a strong union supporter.  Kathleen _____ from
9   Telemetry used to return my text messages but since May 2010, no longer returns my text
10   messages.  Mariko _____, a co-worker who before the election had been really active, was
11   written up for something and stopped talking to any of us about the Union.  I tried to contact
12   her multiple times before the election and after the election as did some of the ICU nurses and
13   none of us got responses from Mariko.  Elise Sanders will not return my calls or text messages
14   anymore since sometime in May 2010.  I have heard that Elise still talks to Thor, the union
15   representative.  Angel Hernandez was one of our strong leaders and now she won't return my
16   calls or text messages since around May 2010.  Ben Guardado, a night shift ER nurse, was
17   pretty strong but I have heard that he will no longer talk to the night shift ER nurses about the
18   union.  Elizabeth from the Telemetry day shift was a really strong supporter for the union and
19   replied to my text messages and returned my phone calls but has not attended any meetings
20   since the Union won the election and has not returned my text messages.  Sometime before I
21   was fired, either in the last week of April or beginning of May 2010, I spoke to Mohammed
22   Hussin, an RN in the ER, who told me that he quit Chino because he felt that he was going to
23   be targeted because his picture was in the Union's flyer.
24   /////

I have carefully and completely read and understand the contents of this page: 

Page 4 of 5

**Exhibit 3**
**Page 148 of 402**

1  I am being provided a copy of this Confidential Witness Affidavit for my review.  If, after reviewing this
2  affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately
3  notify the Board Agent.  I understand that this affidavit is a confidential law enforcement record and
4  should not be shown to any person other than my attorney or other person representing me in this
5  proceeding.

6  I have read this statement consisting of  5  pages, including this page, I fully understand its contents,
7  and I certify that it is true and correct to the best of my knowledge and belief.

8
9
10                                              Ronald Magsino (Signature of Witness)

11  Subscribed and Sworn Before Me at
12  Chino, June 23, 2010
13
14
15  Joanna Silverman, Board Agent
16  National Labor Relations Board


I have carefully and completely read and understand the contents of this page: 

Page 5 of 5

Exhibit 3
Page 149 of 402

FORM NLRB-5168
(02-08)

County of _____Los Angeles_____ )
                                     ) SS                         Case ___31-CA-29714___
State of _____California_____ )

### Confidential Witness Affidavit

I _____Lina Teer, being first duly sworn upon my oath, hereby state as follows:

**I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at _____█████████████████_____

Zip Code _____███_____     My mobile number is (include Area Code) 909-287-9328. My telephone

number is 909-628-5109.

I (am) employed by ____Veritas Health Services, Inc., d/b/a Chino Valley Medical Center ("CVMC" or Employer")

located at ____5451 Walnut Avenue, Chino, CA 91710._____

1  Background

2        CVMC is an acute care hospital that is open 24 hours, 7 days a week. There are about 120 registered

3  nurses ("RN") at CVMC. I have been working full-time as a RN at CVMC since December 2000. I started at

4  CVMC in the Medical-Surgical unit. About five or six years ago, I began working in the Emergency department

5  ("ER") at CVMC and I am still working in the ER.

6        The ER is open 24 hours, 7 days a week. There are two shifts in the ER, 7:00 AM to 7:00 PM and 7 00

7  PM to 7:00 AM. I work from 7:00 AM to 7:00 PM, Monday through Friday. I also work every other weekend.

8        There are approximately 30 to 40 RNs in the ER (including several licensed vocational nurses, ("LVN").

9  My current manager is Cheryl Gilliatt ("Gilliatt"). She became my manager a few weeks before the Union election,

10  which was April 1 and 2, 2010.[1] She used to be co-worker in the ER before she became the manager. Manager

11  Gilliatt prepares the schedules in our department. I believe she also can hire; she just hired some new RNs in the

_____

[1] All dates are 2010 unless otherwise indicated.

Page 1

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S C. § 151 et seq  The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and/or related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed Reg. 74942-43 (Dec 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court

**Exhibit 3**
**Page 150 of 402**

FORM NLRB-5168 (2-08) CONTINUED

1   ER, but I do not know exactly how many.  She also has to authority to discipline. I know this because she has

2   disciplined me.  She has also disciplined others including Ronald Magsino ("Magsino"), a fellow RN in ER.  Before

3   Manager Gilliatt, Carlos Gonzalez ("Gonzalez") was my manager.  He was my manager for about four years at

4   the ER before he was promoted to position in the corporate office

5   <u>Union Activity</u>

6        United Nurses Associations of California/Union of Health Care Professionals, ("UNAC" or "Union") tried to

7   organize at CVMC in 2008 without success.  In mid December 2009, the Union started to organize.  One of my

8   coworkers in ER, Sharon Lemoin ("Lemoin") (I am not sure of the spelling of the last name), called Kyle Serrette

9   ("Serrette"), the Union organizing director, to help initiate an organizing campaign at CVMC.   Lemoin held a

10   meeting at her house sometime in mid December with the Organizer Serrette.  Besides Lemoin and Organizer

11   Serrette, present at the meeting were me and Marlene Bacani ("Bacani"), a RN in the ER.  Organizer Serrette told

12   us more about the Union in general and asked all of us why we wanted to organize.  My own answer was that

13   management took so much from us, about 8% out of our salary and had taken all my accrued sick time away from

14   me.  Organizer Serrette asked us who would be supportive of the Union   We all identified people that we knew,

15   including Magsino. Organizer Serrette  asked me if I would talk to Magsino on my free time to see if he would be

16   interested.  That was the gist of the meeting.  A few days after the meeting, I talked to Magsino on my lunch break

17   about the Union.   I asked him if he would like to talk to Organizer Serrette about the Union and provided his

18   number so he could talk to Organizer Serrette himself

19        Sometime after Christmas in 2009, Magsino and I began talking to the RNs in the employee parking lot

20   about the Union.  We did this during our free time and talked to the RNs after they had gotten off they shift.  We

21   did this about five times on various days.  For the RNs who were interested, we provided Organizer Serrette's

22   number and also the place, time and date of our first organizing meeting at Denny's.  We also asked the RNs to

23   pass on the information to anyone else they thought would be interested in supporting the Union.  During the

24   various times when Magsino and I were in the parking lot, I noticed the security guards were watching him and

25   me, about 30 to 40 feet away from us in go-carts.  This is unusual because the security guards are never in the

26   parking lot.  I never have seen them in the parking lot on a regular basis waiting there.  I do not know the security

27   guards names but I am familiar with their faces and they are familiar with mine because ER is a hectic place and

28   security guards are often in the ER to handle various issues that may arise.

Exhibit 3   TU
Page 151 of 402

FORM NLRB-5168 (2-08) CONTINUED

1    Within the same week, the first organizing week meeting was held. At the first meeting about eight to

2    nine RNs attended. At the meeting, Organizer Serrette told us more about the Union in general and also

3    answered questions about the Union. In addition, all the nurses were asked to fill out cards, which had their

4    contact information and also statement of why they wanted to have the Union.

5    There were other organizing meetings held as organizing progressed. At these meetings, the RNs were

6    also asked to fill out cards, which had their contact information and also statement of why they wanted to have the

7    Union. Organizer Serrette also reserved a conference room in a hotel for about a week so that RNs could come

8    in on their own to talk to him, ask questions, and fill out cards with their contact information and a statement of

9    why they wanted to have the Union. Over the course of these meetings, about 108 RNs filled out cards.

10   Sometime at the end of February, a petition for election was field. A few days after the petition election

11   was filed, I received an e-mail from Dr. James. Lally ("Lally"), the Chief Medical Officer ("CMO") of CVMC (I am

12   not sure if this was sent to all employees; however I know at least two other RNs in ER who received it as well,

13   Magsino and Debbie Andrada, another RN in ER.) The e-mail basically said not to assist UNAC to enter the

14   hospital. I do not have a copy of the e-mail with me.

15   In addition, about sometime right after the petition was filed, and CMO Lally's e-mail was sent out, on a

16   Saturday or Sunday around 10 (I cannot remember the specific day), I saw what I believe to be an anti-union

17   consultant at the nurses' station in the ER. We have two nurses' stations at the ER, the front nurses' station were

18   the doctors sitting and a back nurses' station. The nurses' stations are about 15 feet apart  Our examining rooms

19   for the patients do not have doors, just curtains. Most of the times the curtains are open and we could see the

20   patients and talk to them from the nurses' station. The patients are less than 10 feet away from the nurses'

21   stations.

22   On that day, I was assigned to the back nursing station. When I saw the anti-union consultant, I greeted

23   her and she introduced herself. She said her name was "Robin." I asked her if she worked there because I had

24   never seen her before. She replied that she was a registered nurse but worked at human resources   (I

25   remember thinking that was strange because it was the weekend and the administrative offices close during the

26   weekend. I have also heard about this Red Robin before because rumors floated around among the ER nurses.)

27   Then, she started to talk to me about the Union and how the Union would cost me money and the Union would

28   make us strike. I asked her how she knew this. She told me she was a registered nurse and had worked with a

3

Exhibit 3
Page 152 of 402

FORM NLRB-5168 (2-08) CONTINUED

1    Union before.  She also said to me that if I did not believe her I could talk to Bernadette _____, a nurse traveler,

2    who had a bad experience with the Union as well.  Then, at that point, I wanted to know exactly who this woman

3    was. I asked for her identification.  I asked who she was exactly.  She said something like, "Just call me Red

4    Robin, I am an independent agent."  At that point, I stopped the conversation and I asked her again, "So you work

5    in HR?"  She said, "Yes, this is my badge" and showed me a badge that said, "Robin, H.R."  I then told her that,

6    "You can buy badges anywhere."  She agreed with me.  Then she said to me if I needed more information I could

7    talk to her or call her.  I said, ok and ended the conversation.  I am not sure if Red Robin talked to anyone else

8    that day besides me.  (I heard from Lisa Methany ("Methany"), a Telemetry nurse, that Red Robin was hired by

9    CVMC to badmouth the Union and to turn people against the Union.  Methany told me she spoke to Red Robin

10   and that she had seen Red Robin at the Telemetry nurses' station all day.  Methany also told me about another

11   man named "Dan" who was in Telemetry with Red Robin.  She also mentioned that Dan was also talking about

12   the Union in Medical-Surgical  I have never met him.

13        Sometime after the petition for election was filed, the Employer starting posting anti-Union flyers in the

14   "radio room" in the ER.  (The Radio Room is the communication room for nurses to paramedics.)  I personally

15   saw them in the radio room.  I also saw flyers on the desk at the nurses' stations.   I also saw flyers in the

16   employee break rooms.  I have attached one of these flyers as Exhibit A.  I have personally seen this particular

17   flyer in the radio room, nurses' station and employee break room.  This flyer talks about the Employer's pre-union

18   flexibility with scheduling, including "scheduling rearranged to make it to school or another job."

19        About three weeks before the election, which was to be held on April 1 and April 2, each of the RNs in

20   ER, including myself, were called individually into Manager Gonzalez' office where he told us how he felt about

21   the Union and how it would change the relationship with management and employees.  Manager Gonzalez called

22   me into his office that week sometime after lunch.  At the time, I did not know what the meeting was going to be

23   about, I thought it would be something related to patient care or charting.  When I came into his office, he handed

24   me a piece of paper  I looked at the paper and noticed that it was a flyer made by the Employer with some

25   wording about the date of the election and "Say No" to the Union.  Manager Gonzalez started to tell me that we

26   are going to have an election on April 1 and April 2 and asked me if I knew that the Union to be elected would

27   change the relationship between management and the employees.  I just looked at him and smiled in response.

28   He then said, "You know how you take a whole month to go overseas?"  Again, I looked at him and smiled and

4

Exhibit 3
Page 153 of 402

FORM NLRB-5168 (2-08) CONTINUED

1   did not say anything. I then asked him if that was it. He said yes and asked me to call Magsino into his office. (I

2   sent this flyer to Organizer Serrette once the meeting was over.) I do not have a copy of this flyer with me.

3   About two week before the election, Organizer Serrette set up a conference room in the hotel for about a

4   week where RNs could come in to fill out cards to confirm they still wanted to have a union. There were about 90

5   RNs that filled out cards with their contact information and an explanation of why they wanted to have the Union.

6   A few days before the election, on or around Sunday March 28 or Monday March 29 in the evening, I

7   distributed copies of a flyer picturing CVMC RNs holding a sign that read, "I'm Voting Yes" to Elizabeth _____,

8   a nurse in Telemetry; Kirsten ____, a nurse in Medical-Surgical; and Bacani (who also goes to the ICU on her

9   break time.) I met Elizabeth and Kirsten in the employee parking lot that evening after work to give them the

10  copies of the flyer. I met Bacani at her house to give her copies of the flyer. I was not going to be work the next

11  two days so I asked the RNs to post copies of the flyers, during their breaktime, in all the employee break rooms

12  and employee locker rooms. I told them *not* to post them in any patient care areas – including bathroom for

13  patients, no hallways, nurses' stations, etc. I have attached the flyer as Exhibit B. I am also pictured in the flyer

14  and have circled my picture on Exhibit B.

15  There was also another flyer distributed. I have attached it as Exhibit C. This flyer is an updated version

16  of the flyer I had distributed with more RNs pictured on the flyer. I am pictured in the flyer, and have circled my

17  picture on Exhibit C. I believe this picture is me, but this copy of the flyer cut my picture in half so it only shows

18  the left and right side of me. I did not distribute this flyer myself. I am not sure how this flyer was distributed.

19  I believe one of these versions of the flyer was also mailed to RNs because I received one at my house.

20  I do not know which version it was.

21  After these flyers were distributed, CMO Lally sent an e-mail to me (and I assume to all the RNs in the

22  hospital) stating that CVMC would have UNAC prosecuted for distributing the flyers. I do not have a copy of the

23  e-mail. I believe that was intimidation tactic. I personally found it intimidating since my face was on the flyer.

24  Employer's Knowledge

25  I know that both of my managers, Gonzalez and Gilliatt, are aware of my union activities. I know

26  Manager Gonzalez knew about my activities because I had a conversation with him right before he was

27  promoted. I came into his office and said, "What happened. I read about your promotion from Dr. Lally." He told

28  me that he was being sent away to the corporate office. I asked him, "Is this because of the Union?" His answer

5

Exhibit 3
Page 154 of 402

1   was something like, "I never said anything about the Union, but do whatever is best for you."  I assume from what

2   he said that he knew that I was involved with this union activity.  He also has made jokes on two occasions   In

3   early January, in the radio room, I was with Manager Gonzalez; Susie Eiley ("Eiley"), a RN and union supporter;

4   and another nurse, but I cannot remember who it was.  The RNs and I were talking and Manager Gonzalez was

5   listening. We were talking about the 8% benefit being taken away and the sick time being taken away.  We all

6   were talking about that and told Manager Gonzalez that  that was the reason why we wanted to form a Union.  He

7   said something to me like, "this is another one that needs to find another job."  Then, sometime at the end of

8   January, he made a joke, at the nurses' station saying something like, "Lina is about to get fired "out of the blue.  I

9   believe he was referring to my union activity.  It was not related to my work performance or anything related to

10   work.

11      I know Manager Gilliatt is aware of my union activity.  Although I did not see her at the first union meeting,

12   I heard that she was at the first organizing meeting, when she was still a staff nurse.  She was also present when

13   other RNs at the nurses' station would joke and refer to me as the "Union rep" or say, "Oh here we go, the

14   trouble" or "Union supporter."   Before Manager Gilliatt was promoted, she was a staff nurse in ER but also a per-

15   diem charge nurse.  Because of this title, she could not vote and belong in the bargaining unit.  However, at the

16   first meeting, she did knot know she could not vote, so she did come to one of the first rounds of meetings to fill

17   out a card expressing her interest in the Union and why she wanted to have a union.  I did not personally see the

18   card, but I am pretty sure Organizer Serrette has her card.  Therefore, I believe she had an idea who were the

19   Union supporters.

20      In addition, I was mentioned in the Daily Bulletin newspaper on Tuesday April 6.  I have attached the

21   newspaper clipping as Exhibit D.  I know CMO Lally was also aware of my activity.  On Monday, April 5, sometime

22   after lunch, before the newspaper article ran on April 6, I saw CMO Lally at the nurses' station with several RNs  I

23   came up to say hello to him and he replied to me in an angry way, "Thank you for your newspaper conference"

24   and he was looking at me angrily.  He can be intimidating looking at you in an angry way.  The RNs there asked

25   me what I did since he referred to a "newspaper conference "  I did not reply, and I just walked away.  I believe he

26   knew about the article and the statement I made before the April 6 issue came out

27   Discipline

6

Exhibit 3
Page 155 of 402

FORM NLRB-5168 (2-08) CONTINUED

1    Discipline

2         On April 15, around 9:00 AM, while I was working, Manager Gilliatt called me into her office.  There was

3    no one present in the office besides us.  She handed me a performance improvement form and told that I had

4    missed the mandatory staff meeting on April 8 and that she had to reprimand me.  (There is a sign-up sheet for

5    every meeting, so management knows if we miss the meeting.)  I have attached the performance improvement

6    form as Exhibit D. (Even though it is dated April 9, I was not given this until April 15.  I am sure of this because on

7    April 9, I clocked in and the charge nurse, Ann Johnson, asked if I wanted to attend an ER class.  I said yes and

8    she told me clock out and go to the ER class.)

9         I told Manager Gilliatt that I already had an agreement with Manager Gonzalez that I would be off

10   Tuesday and Wednesday every week for six weeks to teach at a nurses' program at Mount San Antonio College

11   ("MtSac").  I said that he gave me verbal approval and that it was on my schedule that I was to have Tuesday and

12   Wednesday off for six weeks.  She told me that she had to reprimand me anyway.  I said I guess it doesn't matter

13   then if I get approval or not.  She then told me I had to sign the form.  I did sign it, but also wrote a comment.

14   That was the end of the meeting.  I told her I was going to make a copy my discipline.  The meeting ended with

15   her shortly thereafter   At that point, I was confused how someone who does not make a mistake could be

16   reprimanded for no reason.  (At the time when I was talking to Manager Gilliatt, I mistakenly thought the

17   mandatory meeting, on April 8, was a Wednesday.  Now I realize that April 8 is a Thursday.  I cannot remember

18   right now why I was unable to attend that meeting.)  I know that I was at school teaching that day the meeting

19   occurred.)

20        I also know that Romeo _____, an RN in the evening shift, missed this April mandatory meeting   He was

21   also reprimanded and had never been reprimanded before.  I know this because Romeo told me.  I know Romeo

22   is a union supporter because he has attended the organizing meetings.  I also just saw him last Friday at a Union

23   meeting.

24        The mandatory staff meetings are sporadic.  Last year, there were meetings every three months.   The

25   year before that, it was a monthly meeting.  At these meetings, we go over what is going on in the ER, discuss

26   ways to improve performance, and receive updates on new things happening in the ER.  These meetings can

27   occur anytime at management's discretion.  They notify us from two days to five days before the meeting.

7

Exhibit 3   TL
Page 156 of 402

FORM NLRB-5168 (2-08) CONTINUED

1   I have never been disciplined before at CVMC.  I do not have any clue about the disciplinary process at

2   all because I have never been disciplined.  In addition, I have missed many mandatory staff meetings before in

3   the past.  Last year, I only attended one mandatory staff meeting and was never reprimanded.  The year before,

4   in 2008, I did not attend any of the meetings and was never reprimanded.  I believe that all ER staff have at one

5   time, missed the mandatory staff meeting and have never been reprimanded.  I know that Magsino and Andrada

6   have missed mandatory staff meetings before and have never been reprimanded.

7

8   Employer Meetings

9   I now feel intimidated and fearful of my job.  I feel like I am being watched all the time over what I do.  I

10  feel that everything that I do is being scrutinized.  I know that Magsino's charts have been reviewed.  I know that

11  Magsino has been harassed and called to the office twice a day.  My observation of Magsino's situation makes

12  me fearful about when it is going to happen to me.  I do not know if I will have a job tomorrow because they may

13  discipline me for something else without a real basis.

14  On May 3, Lex Reddy ("Reddy"), the chief who runs the hospital, held a meeting with all the employees.  I

15  believe he is above the CEO and everybody else.  I could not make it to the meeting and was afraid to be

16  reprimanded, and I e-mailed Manager Gilliatt to let her know that I would be out of town and could not attend the

17  meeting.  She said that another meeting would be held.  On May 7, I attended the make-up meeting held by

18  Reddy.  This meeting was for the employees who could not attend the May 3 meeting.  At the meeting, Reddy

19  brought up the incident of Manager Gilliatt's car being keyed.  He accused a Union supporter or someone from

20  Union of keying Manager Gilliatt's car on April 2.  (On April 2, sometime around 10.00 AM,  Debra S____, an

21  Emergency Medical Tech Leader, yelled into the ER and said something like  "Cheryl's car has been keyed."

22  Magsino, Manager Gilliatt and I went out to look at her car.  I asked her why she had parked outside in front of the

23  hospital.  We usually park in the back of the hospital and she usually parks near me.  Her answer was that the

24  security guard told her to park there that day.  One of the security guards came by and I said, "Don't worry, we

25  have a camera right here, we have footage right here who keyed your car."   Then, a couple days after the

26  election was over, around April 5, the Employer posted pictures of Manager Gilliatt's car.  I just remember the

27  picture. There might have been a note with it but I do not remember.  CMO Lally also sent out an e-mail accusing

28  a Union supporter of keying Manager Gilliatt's car.  I do not have this e-mail with me.

8

Exhibit 3
Page 157 of 402

1    At the meeting, Reddy also said something like, "Just because the Union won the election it does not

2    mean that you should delay patient care." I think he was accusing us of jeopardizing patient care because we

3    elected a union. He also mentioned the newspaper article in which my statement appeared. He did not refer to

4    me specifically but he said something like, "Apparently a nurse talked to the media on behalf of you guys and told

5    something untrue about Chino Valley. "

6    On the same day, sometime after the meeting, a charge nurse, Ann Johnson, approached me and told

7    me about charge nurse meeting on May 3 with Reddy. She said to me, "Be careful, your name came out in the

8    meeting." I did not say anything to that. I was just stunned. I really do not want to know what they are saying

9    about me because I am sure it is a bad thing and if I learn specifically about what it is I will be even more scared.

10    I am already afraid for my job.

11

12    <u>Conversation with Monica and Elizabeth</u>

13    I have not spoken with two new hires Monica and Elizabeth, especially regarding the Union. I have just

14    said hi and bye. It may be a different person who talked to them. Maybe Yesenia Desantiago, a RN in ER, talked

15    to Elizabeth because I know she is providing orientation to Elizabeth

16    /////

17    /////

18    /////

19    /////

20    /////

21    /////

22    /////

23    /////

24    /////

25    /////

26    /////

27    /////

28    /////

9

Exhibit 3
Page 158 of 402

FORM NLRB-5168 (2-08) CONTINUED

1      /////

**I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this affidavit again I remember anything else that is relevant, or desire to make changes, I will immediately notify the Board Agent. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this statement consisting of __10__ pages, including this page, I fully understand its contents, and I certify that it is true and correct to the best of my knowledge and belief.**

_____
(Lina Teer)

Subscribed and Sworn before me at

_Los Angeles_____

this _17_ day of __May_, 2010.

_____
      Truc Nguyen      / Board Agent
National Labor Relations Board

10

**Exhibit 3**
**Page 159 of 402**

# PROTECT YOUR FLEXIBILITY!

## WHAT MIGHT HAPPEN IF A UNION CONTRACT LOCKS IN WORKING RULES THAT DON'T FIT INDIVIDUAL NEEDS?



### HAVE YOU EVER ...

- been allowed to come in late/leave early because of responsibilities at home?
- been allowed to leave early to pick up a sick child at school?
- had your schedule rearranged to make it to school or another job?
- changed your schedule with a co-worker after it was posted?
- changed your schedule to accommodate your childcare needs?
- been granted a special request over the phone on short notice?
- been granted available overtime to meet your needs as opposed to by strict seniority?
- been given assignments because of your skills, not because of how long you've been there?
- been able to extend your vacation due to an important personal situation?
- had car trouble and been given time off to take care of repairs?
- made an honest mistake and your director treated it as nothing more than a lesson learned (our practice of "Just Culture")?
- worked overtime even though you were not the next in line for it?
- had special time off for family illness?
- been able to select and attend training classes at Flex Ed cost-free?
- been selected for promotion because of merit and hard work?
- taken advantage of the hospital's open door policy?
- had the opportunity to float to other departments for the purpose of learning?

Contracts require completed and consistent body because anything you can do out of the contract is a privilege that you otherwise would not in the contract, the rules in the contract will prevail.

## CAN UNAC GUARANTEE THAT ANY OF THESE THINGS WILL BE IN A UNION CONTRACT?

## VOTE NO ON APRIL 1 & 2!

Exhibit 3
Page 160 of 402
Exhibit A

# ONLY ONE OPTION ON APRIL 1ST & 2ND

 **Vote YES** to legally secure our wages, benefits, and working conditions in a written contract

 Hope that Prime Healthcare will treat us fairly

 Quit















WE'VE ALR















Exhibit 3
Page 162 of 402

2 of 9



































Exhibit 3
Page 163 of 402

3 of 4



Exhibit 3
Page 164 of 402

# ONLY ONE OPTION ON APRIL 1ST & 2ND

 Vote **YES** to legally secure our wages, benefits, and working conditions in a written contract

 Hope that Prime Healthcare will treat us fairly

 Quit

Exhibit 3
Page 165 of 402













Exhibit 3
Page 166 of 402









































Exhibit 3
Page 167 of 402



Exhibit 3
Page 168 of 402

# CHINO VALLEY MEDICAL CENTER

**PERFORMANCE IMPROVEMENT FORM**

Name: _Lina, Teer_   Position: _Registered Nurse_   Date: _4-9-10_   Dept: _Emergency_

This notice is being issued to call your attention to the following deficiencies in your job performance

| Type of Action | ☑ Verbal Warning ☐ Notice of Disciplinary Suspension _____ days from _____ to _____<br>☐ Written Warning ☐ Notice of Investigatory Suspension _____ days from _____ to _____<br>☐ Final Written Warning ☐ Termination Date: _____ |
|---|---|
| Reason for Action | Explain the nature of performance deficiency and/or unacceptable behavior and how it affects the Department<br>_Missed Mandatory ED Staff Meeting April 8, 2010_ |
| Facts and Events | State the facts leading to this action --- be specific ( second page may be required) |
| Previous Action | Has the employee been counseled or received counseling action for the same or similar reasons?<br>Yes ☐    ☐ No<br>If yes, what type: _____   Date Action was taken: _____<br>Documented? ☐ Yes ☐ No |
| Performance Improvement Plan | State the accepted minimum standards of performance and corrective action steps which must be met by the employee: |
| Improvement Period | Indicate the maximum amount of time allowed for improvement |
| Further Action To Be Taken | Continued failure to meet the minimum standards of the job may result in the following disciplinary action |

Employees Comment:
_I was working @ my other which approved by Carlos, Gonzalez previous manager._

Your signature is not an acknowledgement of fault, but a receipt of notice only

Employee Signature: _____   Date: _____

Supervisors: _____   Date: _4/9/10_

Witness: _____   Human Resources: _____

Exhibit 3

Case 2:11-cv-02852-RA -OP   Document 1-4   Filed 04/05/11   Page 115 of 116   Page ID
#:225

# Daily Bulletin

50¢ PLUS T

SPORTS B1

## CHAMPIONS

**Duke** holds off Butler to win NCAA tournament

LOCAL A4

## Man in charge

Meet Dave Carrier,
Ontario's new fire chief

bulletin.com ● **UPLAND NOW:** COUNCILMAN MUSSER TO RUN FOR RE-ELECTION | **A6**

## ockin' after dark



File Photos

any private functions, such as office parties and business meetings, above, Citizens Business Bank Arena
certs, hockey games, boxing matches and Lakers and Harlem Globetrotters basketball games, below.

### a has club,
### as and parties

**árquez** Staff Writer

O — It's 9:30 p.m. on a Thurs-
and inside the music is blar-
itside girls dressed in skinny
tilettos file into Citizens Busi-
Arena.

y the site for concerts and
nes, the arena has been home

to "The Lounge at the Bank" several
Thursday nights since March.

The three events to date, held inside
the San Manuel VIP Club, have met
with success, with at least 400 people
attending the first one, said Sue
Oxarart, the arena's spokeswoman.

"We saw the potential to do some-
thing with the room so we said, 'Let's go
ahead and try this upscale type of club
atmosphere,'" she said.

While many stores and restaurants
along Fourth Street are shooing away

customers and shutting down after 9
p.m., the arena is coming to life.

But doubling as a nightclub isn't the
only time the arena hosts private
events, Oxarart said.

Since its opening in October 2008,
the arena has been the site for a prom,
several high school and college gradua-
tions as well as business meetings. The
most common use has been for office
parties.

**ARENA A8**



# Hospital
# disputes
# decision

## Chino Valley nurses
## vote to join union

**By Neil Nisperos** Staff Writer

CHINO — Chino Valley Med-
ical Center administrators are
looking to invalidate a vote
taken by their nurses to union-
ize.

The nurses on Thursday and
Friday voted 72-39 to join the
United Nurses Associations of
California/Union of Health
Care Professionals, which rep-
resents nurses in Southern Cal-
ifornia.

James Lally, president and
chief medical officer of the
medical center, said the UNAC
and its representative engaged
in harassment, intimidation
and other unlawful conduct in
order to coerce nurses to vote
in favor of the union.

"The supporters kept up a
constant barrage of phone
calls and verbal harassment to
those that would not cooper-
ate," Lally said. "We had a
small group of nurses bully
and badger the quieter, nicer
people."

The National Labor Rela-
tions Board must approve and
ratify the vote.

The ratification process may
be delayed after medical cen-
ter officials filed their objec-
tions to the vote.

**"We wouldn't do
anything that
would violate labo
laws. ... We're
fairly confident we
will be able to
defend ourselves
against any
allegations they
may be putting
forward."**

EVE ROJAS, spokeswoman for
the the UNAC/UHCP

Nurses said they hope union
representation and a negoti
ated contract would help allevi
ate understaffing, allow them
to spend more time with
patients and improve benefits.

"As nurses, we want to cre
ate a work environment tha
makes it possible for us to pro
vide the highest quality of care
to our patients," said Teer Lim
nurse in the hospital's Emer
gency Department. "Now tha
we are members o
UNAC/UHCP, we can directl

**UNION A6**

## mona residents show ire



**Thomas R. Cordova** Staff Photographer

ch, a 36-year resident of Pomona, holds up a sign
f saving the Pomona Police Department before
f the City Council meeting Monday.

### Vote on Police Department
### delayed; crowd not happy

**By Lori Consalvo** Staff Writer

POMONA — A vote that carried the potential to allow
the Los Angeles County Sheriff's Department to evaluate
the costs of providing service to the city was postponed at
Monday's City Council meeting, frustrating a large crowd
of residents who gathered to voice their displeasure at the
idea of outsourcing the city's police.

"This is the game that this City Council plays with the
people of Pomona," resident Carol Schlaepfer said. "And
we're disgusted. And we're going to be back (for the next
meeting)."

Shortly after the meeting started, the announcement
was made that the vote would be moved to April 19.
Information had been presented to the council members
during closed session that made them chose to continue

## Councilman's day
## in court draws near

### Gutierrez trial set to begin Monday

**By Mike Cruz** Staff Writer

A criminal case against Ran-
cho Cucamonga Councilman
Rex Gutierrez on Monday
inched ever closer to trial.

Lawyers in the case against
Gutierrez appeared briefly
Monday in San Bernardino
Superior Court to confirm a
trial readiness hearing on Fri-
day before Judge Duke Rouse.
The trial is scheduled to start
Monday, April 12, but could
still face a last-minute delay.

Deputy District Attorney
John Goritz co

### INSIDE

**CLOSE TO A DEAL?**
State, local prosecutors meet
with county counsel to
discuss Colonies **A3**

further about Gutierrez's case
during a brief telephone con
versation.

Charges against Gutierrez
50, stem from an investigation
into alleged misconduct in the
county Assessor's Office unde
the helm of former Assesso

**GUTIERREZ A**

**POMONA A8**

• blogs.dailybulletin.com/**chinovalleynow**
• blogs.dailybulletin.com/**claremontnow**
• blogs.dailybulletin.com/**uplandnow**
• blogs.dailybulletin.com...
• blogs.dailybulletin...
• blogs.dailybulletin...
• More blogs at **dail**

## Celtic Hoops girls soccer team wins tournament

The Celtic Hoops soccer team of Upland won the Diamond Bar/Walnut Valley Shootout soccer tournament the weekend of March 29.

The team played three games in the preliminary round, winning two and tying one. They scored six goals and gave up two. They won in the finals 2-0. The team is a third-year team consisting of girls from Upland, Rancho Cucamonga, Chino and Glendora. They play in the Cal South gaming circuit. All girls born on or after Aug. 1, 1996, can join the team.

A rating clinic will be held April 26 at Pioneer Junior High School, 245 W. 18th St., Upland. Practices are year-round from 5:30 to 7 p.m. on Mondays and Wednesdays. Open tryouts will continue through the summer.

Information: e-mail coach Farzad Yektafar at wejumpin@msn.com

## Councilman Ray Musser to run for re-election

Councilman Ray Musser has announced he will run for re-election in November.

Musser has served on the City Council since 1998.

"I am grateful to the people of Upland for allowing me to serve ... these past 11 years," he said.

The city needs financially conservative insight, leadership and experience to help weather the financial storm ahead, Musser said.

"I believe the city needs to keep a strong independent voice on the council."

## Woman's Club schedules luncheon for April 13

The Upland Woman's Club



Courtesy Photo
The Upland Celtic Hoops G96 soccer team won the Diamond Bar/Walnut Valley Shootout soccer tournament 2-0. Tryouts for the team will be held this summer.

will hold its April luncheon at noon April 13 at the clubhouse, 590 N. Second Ave. All women are welcome and do not have to be Upland residents to attend. Reservations must be made by Friday. Cost is $8.50. To make reservations, call 909-338-3839.

## Fundraiser set for band, color guard at UHS

The Upland High School Marching Band and Color Guard will hold a garage sale from 7:30 a.m. to 2:30 p.m. April 17 in the school's east parking lot at Redding Way and 11th Street. They are looking for donated items to sell and for volunteers to help with setup, selling and cleanup. People interested in volunteering can e-mail Charlotte Protesi at gandalf 71163@yahoo.com.

## UHS's music program to hold "Spring Review"

The Upland High School music program will hold its "Spring Review" at 7 p.m. Wednesday in the High-

lander gym, 565 W. 11th St. The percussion ensemble will perform "A Respite in Three." The Junior Varsity Winter Guard will perform "Blues Traveler," and the Varsity Winter Guard will perform "Deep Forest." There will also be a performance from the jazz ensemble. Admission is $2. Doors open at 6:45 p.m.

## Uplanders Club plans April 14 lunch meeting

The Uplanders Club will hold its monthly luncheon and general meeting at 11:15 a.m. April 14 at Christophe's restaurant, 2295 N. Second Ave. Everyone is invited to attend. Guests must RSVP to Elinor Hamilton by calling 909-982-4439 by Friday.

## Kiwanis, local clubs to collect food for shelter

The Upland-Foothill Kiwanis is participating in "Kiwanis One Day" on Saturday. All Kiwanis clubs participate in the event. Upland-Foothill Kiwanis will collect food for Foothill Family Shelter and

Hope Partners Sova pantry.

The club, the Upland High School Key Club, junior high builder's club and the K-Kids club have been gathering food and will bring it to the Kiwanis meeting at 7 a.m. Wednesday at the Upland YMCA, 1325 San Bernardino Road.

## Foothill Family Shelter needs pantry items

Foothill Family Shelter is in need of donations to replenish its food pantry. The club, the Upland High School needs diapers of all sizes, wipes, canned fruits and vegetables, boxed dinners, cereal, granola bars, peanut butter and any nonperishable food. Donations can be dropped off at 1501 W. Ninth St., Suite D, from 9 a.m. to noon and 1 to 5 p.m. Tuesday through Friday.

## Western Christian sets cow-plop fundraiser

Western Christian High School is having a "Cow Chip Plop" fundraiser from noon to 3 p.m. April 17 on the school's athletic field, 100 W. Ninth St. There are 2,000 deeds, measuring one square yard, available. There will be a $5 donation for each deed. Deeds can be purchased from any Athletic Booster member, high school or middle school Lancer-athlete, ASB or drama student. Deeds can be purchased the day of the event until 11:45 a.m. There will be prizes for first, second and third plop. At noon, three cows will be released onto the football field. The first three plops are measured and recorded. Rules are available at: westernchristian.org/highschool/2010/03/28/cow-chip-plop.

sandra.emerson@
inlandnewspapers.com

## Union p...
## Upland ...
## of Veriz...

### Local wants outso...

By Sandra Emerson
Staff Writer

UPLAND — Verizon Communications employees on Monday held an informational picket outside of the company's corporate office to demand that limitations be placed on the outsourcing of jobs and hiring of contractors.

The employees, who are members of the Communications Workers of America union, will stage similar pickets throughout the week.

Verizon and union representatives are currently negotiating a new contract for the employees.

"The bottom line is Verizon is digging their heels in the dirt, and they do not want any restrictions on contracting nor outsourcing our jobs out of California, and that is some language we are trying to achieve in this round of negotiations,"

said ...
empl...
Worl...
9588...

Ve...
good...
time...
said ...
of me...

"O...
ate n...
tinue...
wage...
Davie...
our ...
devic...
vices ...
a sup...
and t...

The ...
N. Mc...

Ver ...
teleco...

sandra.e...
909-483...

### DAILY BULLETIN GOES ...



Dr. Linus and Maureen Ojukwu of Cla... Robert and Linda Clinton of Upland to... on a working vacation recently to the ... Republic. They were on a medical mis... capital, where more than 2,000 peopl... assistance and food. They visit the co... medical assistance every year.

The Inland Valley Daily Bulletin likes to ... along on your next vacation. Snap a pho... friends and family holding a copy of the ... interesting, and we'll publish it here. Be ... names of everyone in the picture, the da... photo was taken, as well as a phone nur... contact you for verification. Send all that ... Valley Daily Bulletin on Vacation, 2041 E ... CA 91764; or send the information in an ... photo attached, to citydesk@inlandnews...

---

## UNION
### From A1

impact patient care without fear or intimidation."

Eve Rojas, spokeswoman for the the UNAC/UHCP, said the union ran a clean campaign.

"We wouldn't do anything that would violate labor laws," Rojas said. "The goal is ultimately to ensure these nurses have the rights they need and they're able to take advantage of those rights. We're fairly confident we will be able to defend ourselves against any allegations they may be putting forward."

The medical center's claim is similar to one made by UNAC officials in 2008, when nurses voted against unionizing. Union officials then charged that the medical center violated the National Labor Relations Act by using

unfair coercion tactics in order to persuade employees to vote no.

The objections were withdrawn earlier this year in order for last week's election to be held, Rojas said.

"The primary goal of the nurses at Chino Valley is to make sure they can give their patients thorough and consistent care without worrying about losing their jobs in the process," said Kathy J. Sackman, a registered nurse and UNAC/UHCP president.

UNAC/UHCP represents nurses and other health care professionals in Southern California. It is affiliated with the National Union of Hospital and Health Care Employees and the American Federation of State, County and Municipal Employees, AFL-CIO.

nell.nisperos@inlandnewspapers.com
909-483-9356

## GUTIERREZ
### From A1

Bill Postmus. Gutierrez formerly worked there as intergovernmental relations officer.

Prosecutors allege that Gutierrez, while employed by the county Assessor's Office, attended city events for Rancho Cucamonga while on county time. He then billed the city for mileage and collected pay from the county, according to earlier court testimony.

But defense lawyer James Reiss counters that Gutierrez was an exempt employee with the county and had no set hours. Also, under the supervision of former Assistant Assessor Adam Aleman, the defense says no specific rules existed about notations on timecards for working half-days, on projects or attending events.

Reiss did not return phone calls for comment.

Prosecutors also alleged at a Jan. 29 hearing that evidence showed Gutierrez's employ-

ment at the county Assessor's Office from March 2007 to January 2009 was "political payback" for voting in favor of development projects for Rancho Cucamonga developer Jeff Burum.

A spokesman for Burum has denied any wrongdoing by the developer.

In a criminal complaint filed May 27 in Superior Court, Gutierrez was charged with two counts of grand theft, embezzlement and presenting a false claim.

Others charged in the Assessor's Office investigation include Aleman, Postmus, former Assistant Assessor Jim Erwin and former Taxpayer Advocate Gregory Eyler.

mike.cruz@inlandnewspapers.com
909-386-3880

8806 E. Las Tunas Dr., San Gabriel, CA 91776

# Bankruptcy Experts

### Expert Legal Help at Affordable Rates

Call For Free Consultation
With an experienced Attorney: **(626) 309-0500**

## STOP:
**STOP**
• Harassing Phone Calls
• Wage Garnishment
• Credit Card Bills
• Medical Bills & Other Debt
• Foreclosure

704261

*Join us for a workshop on:*
## The Complete Resource Guide for Baby Boomers

# America... Window...

*A division of Danny Piantanida, Inc. CA Lic#911...*

## WINDOWS
WOOD
VINYL
FIBERGLASS
COMPOSITE
ALUMINUM

## WINDOW FASHIONS
SHUTTERS
SHADES

